# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BOARDWALK PIPELINE PARTNERS, LP, BOARDWALK PIPELINES HOLDING CORP., BOARDWALK GP, LP, BOARDWALK GP, LLC, and LOEWS CORPORATION, | § § § § § § | |
| | § | No. 1, 2022 |
| Defendants-Below, Appellants-Cross Appellees, | § § § | Court Below: Court of Chancery of the State of Delaware |
| v. | § § | C.A. No. 2018-0372 |
| BANDERA MASTER FUND LP, BANDERA VALUE FUND LLC, BANDERA OFFSHORE VALUE FUND LTD., LEE-WAY FINANCIAL SERVICES, INC., and JAMES R. MCBRIDE, on behalf of themselves and similarly situated BOARDWALK PIPELINE PARTNERS, LP UNITHOLDERS, | § § § § § § § § § § § | |
| Plaintiffs-Below, Appellees-Cross Appellants. | § § | |

Submitted: September 14, 2022
Decided: December 19, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, Justices; and **LEGROW**, Judge,[1] constituting the Court *en Banc*.

Upon appeal from the Court of Chancery of the State of Delaware: **REVERSED AND REMANDED.**

---

[1] Sitting by designation under Del. Const. art. IV, § 12 and Supreme Court Rules 2(a) and 4(a) to complete the quorum.

William Savitt, Esquire (*argued*), Sarah K. Eddy, Esquire, Adam M Gogolak, Esquire, Wachtell, Lipton, Rosen & Katz, New York, New York; Daniel A. Mason, Esquire, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Wilmington, Delaware; Stephen P. Lamb, Esquire, Andrew G. Gordon, Esquire, Harris Fischman, Esquire, Robert N. Kravitz, Esquire, Carter E. Greenbaum, Esquire, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York; Srinivas M. Raju, Esquire, Blake Rohrbacher, Esquire, Matthew D. Perri, Esquire, John M. O'Toole, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; Rolin P. Bissell, Esquire, Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware, *for Defendants Below, Appellants-Cross Appellees Boardwalk Pipeline Partners, LP, Boardwalk Pipelines Holding Corp., Boardwalk GP, LP, Boardwalk GP, LLC, and Loews Corporation.*

A. Thompson Bayliss, Esquire (*argued*), J. Peter Shindel, Jr., Esquire, Daniel G. Paterno, Esquire, Eric A. Veres, Esquire, Samuel D. Cordle, Esquire, Abrams & Bayliss LLP, Wilmington, Delaware *for Plaintiffs Below, Appellees-Cross Appellants Bandera Master Fund LP, Bandera Value Fund LLC, Bandera Offshore Value Fund Ltd., Lee-Way Financial Services, Inc., and James R. McBride, on behalf of themselves and similarly situated Boardwalk Pipeline Partners, LP Unitholders.*

**SEITZ**, Chief Justice, for the Majority:

Oil and gas pipeline businesses transport petroleum products for their producer-customers. They often organize as Delaware Master Limited Partnerships ("MLPs") to take advantage of tax benefits from Federal Energy Regulatory Commission ("FERC") regulations. Under Delaware law, the MLP sponsor can structure the organizational agreements to permit maximum flexibility over investments and operations. Perhaps most significantly, a sponsor can eliminate fiduciary duties, meaning that an investor's rights are, for the most part, limited to the four corners of the MLP agreements. It is safe to generalize that MLP prospectuses warn of the sponsor's lopsided rights that include their right to make self-interested decisions to the economic disadvantage of the public investors.

The Boardwalk MLP sponsors took full advantage of the flexibility permitted under Delaware law. The Boardwalk limited partnership agreement (the "Partnership Agreement") disclaimed the general partner's fiduciary duties. It included a conclusive presumption of good faith when relying on advice of counsel. It exculpated the general partner from damages under certain conditions. And the sponsors disclosed the investment risks in detail to the public investors.

At issue in this appeal is whether Boardwalk's general partner properly exercised a call right to take the Boardwalk MLP private. Under the Partnership Agreement, the general partner could exercise a call right for the public units if it

3

received an opinion of counsel acceptable to the general partner that a change in FERC regulations "has or will reasonably likely in the future have a material adverse effect on the maximum applicable rate that can be charged to customers."

The Boardwalk MLP general partner received an opinion of counsel from Baker Botts, a Texas-based law firm, that a change in FERC policy met the call right condition (the "Baker Botts Opinion"). Skadden, a New York-based law firm, advised that (a) it would be reasonable for the sole member, an entity in the Boardwalk MLP structure, to determine the acceptability of the opinion of counsel for the general partner; and (b) it would be reasonable for the sole member, on behalf of the general partner, to accept the Baker Botts Opinion (the "Skadden Opinion"). The sole member followed Skadden's advice and caused the Boardwalk MLP general partner to exercise the call right and to acquire all the public units through a formula in the Partnership Agreement.

The Boardwalk MLP public unitholders filed suit and claimed that the general partner improperly exercised the call right. In a post-trial opinion, the Court of Chancery concluded that the general partner improperly exercised the call right because the Baker Botts Opinion had not been issued in good faith; the wrong entity in the MLP business structure determined the acceptability of the opinion; and the general partner was not exculpated from damages under the Partnership Agreement.

The court awarded almost $700 million in damages to the public unitholders for what it found were improperly redeemed units.

On appeal, the Boardwalk entities argue that the court erred as a matter of law and fact when it found that the Baker Botts Opinion was not issued in good faith; erred as a matter of law when it interpreted the acceptability requirement; should have exculpated the general partner and others from damages; and exceeded its discretion when awarding damages. After our review, we agree with the Boardwalk entities that the sole member was the correct entity to determine the acceptability of the opinion of counsel. We also agree with the Boardwalk entities that the sole member, as the ultimate decisionmaker who caused the general partner to exercise the call right, reasonably relied on Skadden's opinion, and that the sole member and the general partner are therefore conclusively presumed to have acted in good faith in exercising the call right. Thus, the general partner and others were exculpated from damages under the Partnership Agreement. We reverse the Court of Chancery's judgment and remand for further proceedings consistent with this opinion. We do not address any other arguments on appeal.

I.

A.

FERC, as the federal regulator of energy policy, sets the maximum rates, known as recourse rates, that oil and gas pipeline owners can charge shippers that

send oil and gas through pipelines.[2]  FERC adjusts recourse rates through an adversarial proceeding known as a rate case.[3]  FERC, shippers, or pipeline owners can bring a rate case if the parties think the rates are too high or too low.[4]  In a rate case, FERC "uses a methodology called cost-of-service ratemaking under which rates are designed based on a pipeline's cost of providing service."[5]  The idea is to allow a pipeline owner to recover its costs and create a reasonable rate of return for investors (the "return on equity" or "ROE").[6]  Cost-of-service ratemaking is a fact-specific and intensive process that considers geographic zones, fixed and variable costs, and the type of shipping.[7]  Recourse rates do not change without a rate case, even with significant cost-of-service changes.[8]  And a change in one cost-of-service variable generally does not support a change in recourse rates without a complete review of all other components: focusing only on one factor is known as "single-issue ratemaking," which FERC generally prohibits.[9]

---

[2] App. to Pls.' Answering Br. ("PAB") at B50, B58, B70 (Pre-Trial Order or "PTO").
[3] *Id.* at 2830–32 (Court Rep.).
[4] *Id.*
[5] *Id.* at 2836; *id.* at B63 (PTO).
[6] *Id.* at B63 (PTO).
[7] *Id.* at B2832–42 (Court Rep.).
[8] App. to Defs.' Opening Br. ("DOB") at A628 (Wagner Tr.) ("[T]he pipeline can't just automatically increase its recourse rates to reflect [an] increasing cost of service . . . . There's got to be a procedural vehicle for recourse rate change to occur . . . .").
[9] App. to PAB at B2831 (Court Rep.) ("The Commission generally does not permit a pipeline to change any single component of its cost of service without addressing all other components.  This is so because, although one component of the cost of service calculation may have increased, others may have declined.  Therefore, in a general NGA section 4 rate case, all components of the cost of service are considered, and any decreases in an individual component may be offset against increases in other cost components.").

FERC's formula for cost of service historically includes the pipeline owner's income taxes. Before 1995, all pipeline owners could incorporate an income tax allowance in their cost of service.[10] Including income tax in the cost-of-service leads to a higher cost of service and generally allows pipeline owners to charge higher recourse rates through the cost-of-service ratemaking process.[11]

The treatment of accumulated deferred income taxes ("ADIT") was one component of the tax allowance.[12] Under federal tax provisions, pipeline owners can utilize accelerated depreciation rather than straight-line depreciation to depreciate their assets.[13] FERC, however, does not recognize accelerated depreciation.[14] As such, pipeline owners sometimes pay lower taxes than anticipated by FERC's cost-of-service calculations. In other words, they claim a depreciated asset before FERC projects the asset will depreciate, and therefore have a lower cost of service than predicted in that year.[15]

---

[10] *See Lakehead Pipeline Co.*, 71 FERC ¶ 61,338 (1995), *abrogated by SFPP, L.P. v. FERC*, 967 F.3d 788 (D.C. Cir. 2020).

[11] *See* App. to PAB at B66–67 (PTO).

[12] *Id.* at B64–65.

[13] *Id.* at B2842–43 (Court Rep.) ("Under Commission ratemaking policies, income taxes included in rates are determined based on the return on net rate base, with the accumulated depreciation offset to rate base calculated using straight-line depreciation. However, in calculating the amount of income taxes due to the IRS, public utilities, interstate natural gas pipelines, and oil pipelines generally are able to take advantage of accelerated depreciation." (quoting Inquiry Regarding the Effect of the Tax Cuts and Jobs Act on Commission-Jurisdictional Rates, 83 Fed. Reg. 12371, 12373-74 (Mar. 21, 2018)).

[14] *Id.*

[15] *Id.* ("Accelerated depreciation usually lowers income taxes payable during the early years of an asset's life followed by corresponding increases in income taxes payable during the later years of

On the flip side, because taxes are deferred to future years, this practice results in greater taxes and higher costs of service than FERC predicts for later years.[16] The system of accelerated depreciation and tax deferral "effectively provides [FERC-regulated pipelines] with cost-free capital" that functions as an interest free-loan.[17] FERC, recognizing this, historically subtracted a pipeline's ADIT balance from the rate base for the cost-of-service calculations, benefiting shippers.[18]

When a rate case concludes, a pipeline's recourse rates are published in a "tariff" schedule.[19] These recourse rates, or "tariff" rates, remain in effect until adjusted by future proceedings.[20] In competitive shipping markets, however, the pipeline owner can negotiate separate contractual rates "not bound by the maximum and minimum recourse rates in the pipeline owner's tariff."[21] These are referred to as "negotiated" rates.[22] Pipeline owners can also "'selectively discount their rates," and the resulting rates are referred to as "discounted" rates.[23] In any case, the tariff or recourse rate is the rate that, should negotiations fail, becomes the default rate.[24]

---

an asset's life." (quoting Inquiry Regarding the Effect of the Tax Cuts and Jobs Act on Commission-Jurisdictional Rates, 83 Fed. Reg. at 12373-74)).

[16] *Id.*

[17] *Id.* at B333 (FERC Notice of Inquiry).

[18] *Id.* at B333–34.

[19] *Id.* at B2965 (Webb Rep.).

[20] *Id.* at B60–61 (PTO).

[21] *Id.* at B64.

[22] *Id.*

[23] *Id.*

[24] *Id.*

The availability of discounted and negotiated rates often mean that a pipeline owner's revenues and ultimate ROE are lower than they would be under recourse rates.[25]

The United States Court of Appeals for the District of Columbia (the "DC Circuit") has addressed tax policy for pipelines organized as limited partnerships, of which MLPs are one publicly traded variety. In a 1990 case, the DC Circuit held that FERC could not engage in "retroactive ratemaking" if it abolished ADIT and required pipeline owners to return the balance over upcoming years, because it would be "forcing a utility to disgorge the proceeds of rates that have been finally approved and collected."[26] And in 1995, in *Lakehead Pipeline Co., Ltd. P'ship*, FERC decided that a pipeline organized as a limited partnership could claim an income tax allowance for partnership interests held by a corporation.[27] The change accounted for the double taxation of the distributions to the investors in the corporate entities that held pipeline partnership interests and the higher returns those investors would require as an offset.[28] This became known as the *Lakehead* Policy.[29]

---

[25] *See id.* at B2592 (Sullivan Tr.) ("A lot of the volumes are being done at discounted and negotiated rates, and you have to see how much revenue is actually being recovered from those -- those shippers before you actually know, you know, how you could calculate an appropriate [recourse] rate.").

[26] *Pub. Utils. Comm'n of Cal. v. FERC*, 894 F.2d 1372, 1383–84 (D.C. Cir. 1990).

[27] *Lakehead,* 71 FERC ¶ 61,338.

[28] *Id.* ¶ 62,313–15.

[29] App. to PAB at B66 (PTO).

In 2004, the DC Circuit abrogated the *Lakehead* Policy because the Commission had not "suppl[ied] reasoning for differentiating between individual and corporate tax liability" for the purpose of allocating tax allowances.[30] In 2005, in response to this ruling, FERC abandoned the *Lakehead* Policy and allowed pipeline owners organized as limited partnerships to claim an income tax allowance for all partners, regardless of a partner's corporate status (the "2005 Policy").[31] Pipelines organized as limited partnerships, which do not pay entity-level income taxes but were now "allowed a full tax allowance[,]" became attractive investment vehicles.[32]

B.

Loews Corporation ("Loews") formed Boardwalk Pipeline Partners, LP ("Boardwalk") to take advantage of FERC's policy change and went public in 2005 as an MLP.[33] Typical of interlocking agreements in the MLP structure, Loews owned a majority of Boardwalk's units through a limited partnership: Boardwalk GP, LP (the "General Partner").[34] The General Partner had its own general partner, Boardwalk GP, LLC (the General Partner of the General Partner or "GPGP").[35] The GPGP had a board of directors (the "GPGP Board") and a sole member: Boardwalk

---

[30] *BP W. Coast Prods., LLC v. FERC*, 374 F.3d 1263, 1290 (D.C. Cir. 2004).
[31] App. to PAB at B853 (Court Rep.).
[32] App. to DOB at A571 (Rosenwasser Tr.).
[33] *Id.*
[34] App. to PAB at B41 (PTO).
[35] *Id.* at B44.

Pipelines Holding Corp. (the "Sole Member" or "Holdings").[36] The Sole Member

was a wholly owned subsidiary of Loews and its board (the "Sole Member Board")

was controlled by Loews insiders.[37] As the Court of Chancery summarized the

ownership structure, "[t]hrough Holdings, Loews controlled the GPGP. Through

the GPGP, Loews controlled the General Partner. Through the General Partner,

Loews controlled Boardwalk and its subsidiaries."[38] The Boardwalk subsidiaries

operated interstate natural gas pipeline systems.[39] The following diagram, from

Boardwalk's 10-K, illustrates the partnership/corporate structure:[40]

---

[36] *Id.* at B44–45.
[37] *Id.* at B45–46.
[38] *Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2021 WL 5267734, at *9 (Del. Ch. Nov. 12, 2021).
[39] App. to DOB at A3135 (Form 10-K).
[40] *Id.*

The following diagram reflects a simplified version of our organizational structure as of December 31, 2013:



The GPGP LLC Agreement (the "LLC Agreement") required the GPGP Board to have between five and eight members, with at least three independent directors serving on an audit committee.[41] At the relevant time, the GPGP Board had eight members: four independent directors, and four Loews insiders.[42] The four Loews directors on the GPGP Board were:

---

[41] *Id.* at A1313 (LLC Agreement § 5.1) ("The number of directors (the 'Directors') constituting the Board (the 'Board') shall be at least five and not more than eight, unless otherwise fixed from time to time pursuant to a resolution adopted by the Sole Member."). The LLC Agreement requires only three independent directors to serve on an audit committee, but it is otherwise silent regarding the appointment of independent directors. *Id.* at A1313–14 (LLC Agreement § 5.2).

[42] App. to PAB at B44–45 (PTO).

• Kenneth I. Siegel, Senior Vice President of Loews and Chairman of the GPGP Board;

• Andrew H. Tisch, the Co-Chairman of the board of directors of Loews, the Chairman of the Executive Committee of Loews, and member of the Office of the President of Loews;

• Peter W. Keegan, a Senior Advisor to Loews; and

• Stanley C. Horton, the President and Chief Executive Officer of Boardwalk.[43]

During the relevant period, the Sole Member directors were Siegel, Keegan, and Jane Wang, a Vice President of Loews.[44]

C.

There was always a possibility that FERC tax policy could change again.[45] Thus, when Loews took Boardwalk public, it included a call right in Section 15.1 of the Partnership Agreement.[46] The call right gives Boardwalk's General Partner the right to acquire Boardwalk's public limited partner interests under two Partnership Agreement provisions: Section 15.1(a) if the General Partner and its affiliates own at least 80% of Boardwalk's total outstanding units; or Section 15.1(b) if the General Partner and its affiliates own more than 50% and the following condition is met:

---

[43] *Id.*

[44] *Id.* at B46 (PTO).

[45] For instance, shippers challenged the 2005 FERC Policy immediately, and Loews was concerned FERC might change course. *E.g., ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 955 (D.C. Cir. 2007) (rejecting challenge to 2005 FERC Policy due to showing of reasonableness).

[46] App. to DOB at A572 (Rosenwasser Tr.) ("[Loews was] not prepared to go forward with a Boardwalk public offering as an MLP if Lakehead were reversed or interpreted in a way that would be materially adverse to . . . Loews . . . so [the Call Right] . . . is a reflection of the way they dealt with that risk.").

The General Partner receive[s] an Opinion of Counsel that the Partnership's status as an association not taxable as a corporation and not otherwise subject to an entity-level tax for federal, state or local income tax purposes has or will reasonably likely in the future have a material adverse effect on the maximum applicable rate that can be charged to customers . . . .[47]

The "Opinion of Counsel" definition in the Partnership Agreement required that the "written opinion of counsel" be "acceptable to the General Partner."[48] In other words, before the General Partner could exercise the call right under Section 15.1(b), the General Partner had to find the opinion acceptable. The Partnership Agreement did not address which entity would act on behalf of the General Partner in accepting the opinion, the Sole Member or the GPGP Board.[49] As explained later, these details were set forth in the LLC Agreement.[50]

The Partnership Agreement also provided that, in deciding whether to exercise the call right, the General Partner was free of any fiduciary duty and acted in its individual capacity.[51] In other words, it was bound only by the non-waivable

---

[47] *Id.* at A3117–18 (Partnership Agreement § 15.1).

[48] *Id.* at A3030 (Partnership Agreement § 1.1); *Bandera*, 2021 WL 5267734, at *1.

[49] App. to DOB at A3030 (Partnership Agreement § 1.1).

[50] *Id.* at A1313–21 (LLC Agreement Art. 5).

[51] *See id.* at A3084 (Partnership Agreement § 7.1(b)) ("[T]he execution, delivery or performance by the General Partner . . . of this Agreement or any agreement authorized or permitted under this Agreement (including the exercise by the General Partner or any Affiliate of the General Partner of the rights accorded pursuant to Article XV) shall not constitute a breach by the General Partner of any duty that the General Partner may owe the Partnership or the Limited Partners . . . under this Agreement (or any other agreements) or of any duty stated or implied by law or equity."); App. to DOB at A3091 (Partnership Agreement § 7.9(c)) ("Whenever the General Partner makes a determination or takes or declines to take any other action . . . in its individual capacity . . . then the General Partner . . . [is] entitled to make such determination or to take or decline to take such

implied covenant of good faith and fair dealing.[52] Once the General Partner received an acceptable opinion, the General Partner had 90 days to trigger the call right, after which it would purchase all outstanding limited partner interests "at a purchase price . . . equal to the average of the daily Closing Prices . . . for the 180 consecutive Trading Days immediately prior to the date three days prior to the date" on which the General Partner had mailed notice that it would be exercising the call right.[53]

Two other Partnership Agreement provisions were relevant to the call right exercise. The first was Section 7.8(a) that exculpated the General Partner from monetary liability absent bad faith, fraud, willful misconduct, or criminality.[54] The second was Section 7.10(b) that provided a conclusive good faith presumption for any action taken in reliance on expert advice, including that of legal counsel.[55]

D.

Between 2005 and 2017, Boardwalk's public filings explained in great detail the General Partner's authority and conflicts, and the self-interested decision-making

---

other action free of any fiduciary duty or obligation whatsoever to the Partnership, any Limited Partner or Assignee, and the General Partner . . . shall not be required to act in good faith . . . .").

[52] *See* 6 *Del. C.* § 17-1101(d) ("To the extent that, at law or in equity, a partner or other person has duties (including fiduciary duties) to a limited partnership or to another partner or to another person that is a party to or is otherwise bound by a partnership agreement, the partner's or other person's duties may be expanded or restricted or eliminated by provisions in the partnership agreement; provided that the partnership agreement may not eliminate the implied contractual covenant of good faith and fair dealing.").

[53] App. to DOB at A3117 (Partnership Agreement § 15.1(b)).

[54] *Id.* at A3090 (Partnership Agreement § 7.8(a)).

[55] *Id.* at A3092 (Partnership Agreement § 7.10(b)).

permitted by the Partnership Agreement.[56] Although the language varied slightly over the years, each filing alerted investors that the General Partner had a call right to repurchase the common units, described the triggering events for the General Partner to exercise its call right, explained the absence of fiduciary duties when exercising the call right, and cautioned that the call right could force limited partners to sell their common units at "an undesirable time or price" leaving no return on their investments.[57] The following warnings are illustrative:

- "Investing in our common units involves risks. . . . These risks include the following: . . . Our general partner has call rights that may require you to sell your common units at an undesirable time or price."[58]

- "If the FERC policy is reversed or implemented in a manner that is disadvantageous to us, our general partner's call right may be triggered. . . . Our general partner has call rights that may require you to sell your common units at an undesirable time or price."[59]

---

[56] *Id.* at A1330, A1337, A1356, A1363-65, A1425, A1436, A1452 (Draft Prospectus); *id.* at A1675, A1685, A1692, A1703, A1714, A1785, A1797, A1813 (Amend. No. 4 to Draft Prospectus); *id.* at A2223, A2233, A2240, A2249, A2260-62, A2333, A2345, A2361 (Amend. No. 5 to Draft Prospectus); *id.* at A2579, A2589, A2596, A2607-08, A2618-19, A2703, A2719 (Final Prospectus); *id.* at A2811 (2005 Form 10-K); *id.* at A2921-22 (2006 Form 10-K); *id.* at A3286 (2017 Form 10-K); *id.* at A3470-71 (2018 Form 10-K).

[57] *Id.* at A1330, A1337, A1356, A1363-65, A1425, A1436, A1452 (Draft Prospectus); *id.* at A1675, A1685, A1692, A1703, A1714, A1785, A1797, A1813 (Amend. No. 4 to Draft Prospectus); *id.* at A2223, A2233, A2240, A2249, A2260-62, A2333, A2345, A2361 (Amend. No. 5 to Draft Prospectus); *id.* at A2579, A2589, A2596, A2607-08, A2618-19, A2703, A2719 (Final Prospectus); *id.* at A2811 (2005 Form 10-K); *id.* at A2921–22 (2006 Form 10-K); *id.* at A3286 (2017 Form 10-K); *id.* at A3470-71 (2018 Form 10-K).

[58] *Id.* at A1330, A1337 (Draft Prospectus); *id.* at A1675, A1685 (Amend. No. 4 to Draft Prospectus); *id.* at A2223, A2233 (Amend. No. 5 to Draft Prospectus); *id.* at A2579, A2589 (Final Prospectus).

[59] *Id.* at A1356, A1425 (Draft Prospectus); *id.* at A1703, A1785 (Amend. No. 4 to Draft Prospectus); *id.* at A2251, A2333 (Amend. No. 5 to Draft Prospectus); *id.* at A2607–08, A2619 (Final Prospectus); *id.* at A2811 (2005 Form 10-K).

- "Our general partner and its affiliates own a controlling interest in us and have conflicts of interest and limited fiduciary duties, which may permit them to favor their own interests to your detriment. . . . These potential conflicts include, among others, the following situations: . . . Our general partner may exercise its rights to call and purchase (1) all of our common units if at any time it and its affiliates own more than 80% of the outstanding common units or (2) all of our equity securities (including common units) if it and its affiliates own more than 50% in the aggregate of the outstanding common units, subordinated units and any other classes of equity securities and it receives an opinion of outside legal counsel to the effect that our being a pass-through entity for tax purposes has or is reasonably likely to have a material adverse effect on the maximum applicable rates we can charge our customers."[60]

- "Our general partner has call rights that may require you to sell your common units at an undesirable time or price. . . . As a result, you may be required to sell your common units at an undesirable time or price and may not receive any return on your investment. You may also incur a tax liability upon a sale of your common units. Our general partner is not obligated to obtain a fairness opinion regarding the value of the common units to be repurchased by it upon exercise of the call rights. There is no restriction in our partnership agreement that prevents our general partner from issuing additional common units or other equity securities and exercising its call right. If our general partner exercised its call rights, the effect would be to take us private and, if the common units were subsequently deregistered, we might no longer be subject to the reporting requirements of the Securities Exchange Act of 1934 ('Exchange Act')."[61]

- "Common units are subject to our general partner's limited call rights. Our general partner may exercise its right to call common units as provided in our partnership agreement or assign this right to one of its affiliates or to us. Our general partner may use its own discretion, free of fiduciary duty restrictions, in determining whether to exercise this right. As a result, a common unitholder may have his common units purchased from him at an undesirable

---

[60] *Id.* at A1363-64 (Draft Prospectus); *id.* at A2260–61 (Amend. No. 5 to Draft Prospectus).
[61] *Id.* at A1365 (Draft Prospectus); *id.* at A1714 (Amend. No. 4 to Draft Prospectus); *id.* at A2261–62 (Amend. No. 5 to Draft Prospectus); *id.* at A2618–19 (Final Prospectus).

time or price.  Please read 'The Partnership Agreement—Limited Call Rights.'"[62]

- "In addition, if (a) our general partner receives an opinion of outside counsel to the effect that our being a pass-through entity for federal income tax purposes has or is reasonably likely to have a material adverse effect on the maximum applicable rates chargeable to customers by our subsidiaries that are regulated interstate natural gas pipelines and (b) at such time our general partner and its affiliates own more than 50% in the aggregate of the outstanding common units, subordinated units and other equity securities, then within 90 days of receiving such opinion our general partner will have the right, which it may assign to any of its affiliates or us, but not the obligation, to acquire all, but not less than all, of the equity securities units held by unaffiliated persons.  The purchase price in the event of such an acquisition will be equal to the average of the daily closing prices of the equity securities over the 180 days preceding the date three days before the date on which our general partner first mails notice of its election to purchase the equity securities.  The limited call rights are exercisable by our general partner, acting in its individual capacity, and may be assigned to its affiliates. As a result of our general partner's rights to purchase outstanding units, a holder of units may have his units purchased at an undesirable time or price. The tax consequences to a unitholder of the exercise of this call right are the same as a sale by that unitholder of his common units in the market.  Please read 'Material Tax Consequences—Disposition of Common Units.'"[63]

E.

In July 2016, the DC Circuit issued its ruling in *United Airlines, Inc. v. FERC*.[64]  *United Airlines* challenged the 2005 Policy.  The DC Circuit found that the tax allowance, as implemented, "permit[ted] [the] partners in a partnership pipeline to 'double recover' their taxes."[65]  MLPs are not taxed at the pipeline level, but

---

[62] *Id.* at A1797 (Amend. No. 4 to Draft Prospectus); *id.* at A2703 (Final Prospectus).
[63] *Id.* at A1452 (Draft Prospectus); *id.* at A1813 (Amend. No. 4 to Draft Prospectus); *id.* at A2361 (Amend. No. 5 to Draft Prospectus); *id.* at A2719 (Final Prospectus).
[64] *United Airlines, Inc. v. FERC*, 827 F.3d 122, 126 (D.C. Cir. 2016).
[65] *Id.* at 127.

FERC allowed a "discounted cash flow" ROE based on taxes for all pipelines.[66]  A partnership investor would recover more than a corporate pipeline investor, because the pipeline was claiming a credit for income tax—without actually being taxed.[67]  The partner would get the benefit of the taxes it would pay as a corporation, and through the partnership.[68]  The court remanded the case with instructions to FERC to figure out how it could fix the double-recovery problem, but noted that its precedent did not preclude the option of eliminating income tax allowance entirely.[69]

In December 2016, FERC issued a notice of inquiry in response to *United Airlines*, seeking comment on the double-recovery problem.[70]  While the review process was underway, Congress passed the Tax Cuts and Jobs Act (the "Tax Act"), which lowered the federal corporate income tax rate from 35% to 21%.[71]  FERC

---

[66] *Id.* at 136 ("First, unlike a corporate pipeline, a partnership pipeline incurs no taxes, except those imputed from its partners, at the entity level.  Second, the discounted cash flow return on equity determines the pre-tax investor return required to attract investment, irrespective of whether the regulated entity is a partnership or a corporate pipeline.  Third, with a tax allowance, a partner in a partnership pipeline will receive a higher after-tax return than a shareholder in a corporate pipeline, at least in the short term before adjustments can occur in the investment market." (citations omitted)).

[67] *Id.* ("These facts support the conclusion that granting a tax allowance to partnership pipelines results in inequitable returns for partners in those pipelines as compared to shareholders in corporate pipelines.").

[68] *Id.* ("[T]he necessary conclusion is that partners in a partnership pipeline receive a windfall compared to shareholders in a corporate pipeline . . . . FERC . . . attributes this disparity in returns to the Internal Revenue Code while simultaneously denying that double-recovery exists.").

[69] *Id.* at 179.

[70] App. to DOB at A3627 (Revised Policy) ("Following the decision of the U.S. Court of Appeals for the District of Columbia Circuit in *United Airlines, Inc., et al. v. Federal Energy Regulatory Commission*, 827 F.3d 122 (D.C. Cir. 2016), the Commission issued a notice of inquiry (NOI) seeking comment regarding how to address any double recovery resulting from the Commission's current income tax allowance and rate of return policies.").

[71] App. to PAB at B71 (PTO).

responded to these changes at the same time to "ensure[] administrative efficiencies by reducing the number of filings required of regulated entities."[72]

At its scheduled meeting on March 15, 2018, FERC took four actions in response to the recent developments (the "March 15 FERC Actions").[73] The first was the adoption of the "Revised Policy" on the treatment of income taxes.[74] The Revised Policy stated that FERC "[would] no longer permit MLPs to recover an income tax allowance in their cost of service" as doing so in combination with a discounted cash flow-driven ROE would result in "an impermissible double recovery" under *United Airlines*.[75] The second action was a notice of proposed rulemaking ("NOPR") that FERC would implement regulations to "address[] the effects of [the] Revised Policy on the rates of interstate natural gas pipelines organized as MLPs."[76] In response to questioning during this meeting, FERC representatives said that they had not yet decided when the policy would apply: "the NOPR [Notice of Public Rulemaking] anticipates that the deadlines for pipeline filings will be late summer or early fall [2018]. We obviously have to go to a final

---

[72] *Id.* at B293 (FERC Meeting Tr.).
[73] *Id.* at B288–90, B293.
[74] App. to DOB at A3627–62 (Revised Policy).
[75] *Id.* at A3633.
[76] *Id.*; App. to PAB at B347–72 (NOPR).

rule first."[77] FERC staff also said more clarification on the Revised Policy would be coming soon—by summer or fall.[78]

FERC "invite[d] interested persons to submit comments."[79] Under the NOPR, interstate natural gas pipelines would file an informational form (the "501-G Form"), allowing FERC to evaluate the impact of the Tax Act on revenue.[80] Pipelines would perform limited cost and revenue studies like those done in rate cases, to show how the tax policy had affected their revenue.[81] In preparing their analysis, firms would use their cost of service from 2017, the new federal income tax, a reduction of allowance from 35% to 0%, and an ROE of 10.55%.[82] In this way, FERC could get a preliminary understanding of whether a pipeline's rate base had changed and whether a rate case was warranted.[83]

FERC also proposed that a pipeline could submit the form a) by itself, b) with a commitment to file a general rate case, c) with a voluntary reduction of recourse rates, or d) with a statement explaining why a rate adjustment was not justified.[84] FERC recognized that many pipelines would not be subject to a rate case, because

---

[77] App. to PAB at B72–73 (PTO).
[78] *Id.*
[79] App. to PAB at B364 (NOPR).
[80] *Id.* at B354–55.
[81] *Id.*
[82] *Id.*
[83] *Id.* ("The Commission and the parties may use this information in considering whether to initiate NGA section 5 rate investigations of pipelines . . . .").
[84] *Id.* at B356–58.

they had rates that did not recover their cost of service, operated in competitive markets with discounted rates, or had settlements providing rate moratoria.[85]

The third March 15 FERC Action was a notice of inquiry asking how FERC should treat ADIT under the Tax Act and the Revised Policy (the "ADIT NOI").[86] The notice of inquiry distinguished between partnerships and other entities and sought comment on options for ADIT treatment, including whether ADIT sums should be eliminated or returned to ratepayers.[87]

The final March 15 FERC Action was the implementation of the *United Airlines* decision against the defendant, SFPP, the gas pipeline owner that was organized as a limited partnership (the "Order on Remand").[88] The order held that "to avoid a double recovery of investor-level tax costs, SFPP should not receive an income tax allowance." [89] The order also required SFPP to revise its rates accordingly.[90] FERC also initiated two rate cases against two other natural gas pipelines.[91] In one of these cases, the order initiating the case cited the Revised

---

[85] *Id.*; App. to DOB at A4281 (Boardwalk Comments on NOPR) ("The market drives pipelines' transportation rates, and pipelines frequently must discount rates below their recourse rate to remain competitive.").

[86] App. to PAB at B327–46 (ADIT NOI).

[87] *Id.* at B340–41.

[88] App. to PAB at B81 (PTO).

[89] App. to DOB at A3595 (Order on Remand).

[90] *Id.* at A3619 ("SFPP shall file revised West Line rates and refunds consistent with this order within 60 days after this order issues . . . .").

[91] App. to PAB at B81–82 (PTO).

Policy in calculating the pipeline's increased ROEs.[92]  In the second, the order initiating the case cited increased ROEs resulting from the Tax Act's change in corporate income tax.[93]

The March 15 FERC Actions ushered in a period of significant uncertainty and industry advocacy.  The price of Boardwalk units dropped 7% in one day, and the Alerian Index, an industry index tracking MLPs, fell by 4.6%.[94]  MLPs rushed to reassure investors with press releases pointing to their long-term contracts with customers—meaning it was unlikely the FERC policies would impact them in the near future.[95]  Boardwalk noted in its press release that it "[did] not expect FERC's proposed policy revisions to have a material impact on the company's revenues."[96] Industry participants meanwhile responded with communications to FERC, including thirteen requests for rehearing regarding the Revised Policy and over a hundred comments on the NOPR and ADIT NOI.[97]

---

[92] App. to PAB at B81–82 (PTO).

[93] *Id.*

[94] App. to PAB at B83 (PTO); App. to DOB at A5727 (Hubbard Rebuttal).

[95] App. to DOB at A686 (McMahon Tr.); *id.* at A746 (Siegel Tr.) ("A lot of Boardwalk's competitors put out press releases to try to calm the market and provide some stability."); *see, e.g.*, *id.* at A3662 (Spectra Energy Partners Press Release) ("SEP anticipates no immediate impact to its current gas pipeline cost of service rates as a result of the revised policy and therefore no impact is expected to its previously provided 2018 financial guidance.").

[96] *Id.* at A3666 (March 19, 2018 Press Release).

[97] *Id.* at A776–78 (Court Rep.).

F.

Boardwalk saw an opportunity to exercise the call right following FERC's announcement.[98]  Exercising the call right at the right time could be advantageous to Boardwalk's sponsors, because the purchase price was based on a trailing market average.[99]  Boardwalk's stock price was already significantly reduced.[100]  In 2014, it had cut its quarterly distributions from $0.5325 to $0.10, sending its unit price down about $20 in value.[101]  It had not recovered.[102]  Under the Partnership Agreement, there was nothing improper about Boardwalk's consideration of the call right at this time.  The Partnership Agreement allowed Boardwalk to exercise the call right to its advantage – and to the disadvantage of the minority unitholders – free from fiduciary duties.

G.

Under Section 15.1(b) of the Partnership Agreement, the call right could not be exercised without an opinion of counsel acceptable to the General Partner.  The day after the FERC announcements, Marc Alpert, Loews' general counsel, contacted Mike Rosenwasser, a partner at Baker Botts, and asked whether Baker Botts could

---

[98] *See* App. to DOB at A687 (McMahon Tr.).
[99] *Id.* at A3117 (Partnership Agreement § 15.1(b)).
[100] App. to PAB at B2148 (Horton Dep.).
[101] *Id.* at B2148 (Horton Dep.); *id.* at B59 (PTO).
[102] *Id.* at B2148 (Horton Dep.).

24

render an opinion.[103] Rosenwasser gathered a group of senior Baker Botts attorneys with extensive industry experience to consult regarding the call right.[104]

Over the following months, Rosenwasser's team worked with Boardwalk, Loews, and Barry Sullivan, a third-party rate expert, to determine whether the FERC announcements had triggered the Section 15.1(b) conditions and whether Baker Botts could deliver an opinion to that effect.[105] Marc Alpert remained involved with the process.[106] Kenneth Siegel, Mike McMahon, Boardwalk's general counsel, and Ben Johnson, Boardwalk's Vice President of Rates and Tariffs, also took lead internal roles.[107] A key project was the development of a financial model to assess the impact to Boardwalk's rates.[108] Baker Botts also consulted with Richards Layton & Finger and, to a lesser extent, Skadden on issues of Delaware law.[109]

> Baker Botts gave its final opinion on June 29, 2018, advising that it was
>
> of the opinion that the status of the Partnership as an association not taxable as a corporation and not otherwise subject to an entity-level tax for federal, state or local income tax purposes has or will reasonably likely in the future have a material adverse effect on the maximum applicable rate that can be charged to customers by subsidiaries of the Partnership that are regulated interstate natural gas pipelines.[110]

---

[103] *Id.* at B83 (PTO). Rosenwasser drafted the call right provision in the Boardwalk Partnership Agreement. App. to DOB at A642–43 (Alpert Tr.).

[104] App. to DOB at A575–76 (Rosenwasser Tr.).

[105] *Id.* at A5125 (Baker Botts Opinion); *id.* at A5113 (Skadden Opinion).

[106] *See e.g.*, App. to PAB at B547.

[107] *See, e.g.*, App to DOB at A3741, A4257; App. to PAB at B542, B547.

[108] App. to PAB at B542.

[109] App. to DOB at A5525; App. to Defs.' Reply Brief ("DRB") at AR22.

[110] *Id.* at A5123 (Baker Botts Opinion).

25

To support its conclusion, Baker Botts summarized the financial data underlying its analysis and provided a comprehensive memorandum explaining the basis for its opinion.

First, Baker Botts concluded that the lack of a tax allowance meant a lower cost of service, which in turn would mean lower rates.[111] It described the rate model used in the financial analysis (the "Rate Model Analysis") as a simplified cost-based determination of the hypothetical indicative rates that would result without the tax allowance after an assumed rate case for all of Boardwalk's pipelines.[112] The indicative rates applied across each pipeline as a whole rather than in market-based or geographic segments.[113] It recognized that the hypothetical model was not a replication of the intensive rate case process, which, should one be initiated, would consider further cost and demand-side adjustments across various geographic zones before setting recourse rates.[114] Baker Botts made key assumptions in this regard, namely "that each Subsidiary would charge all its customers the maximum applicable rate, and as a result, each Subsidiary would recover its entire cost of service" and that "reductions in the maximum applicable rates would not be offset

---

[111] *See* App. to PAB at B476.

[112] *See* App. to DOB at A5125 (Baker Botts Opinion); *see also* App. to PAB at B548–50.

[113] App. to PAB at B548–50 ("In order to provide a comparable rate assessment for each of the assets to assist in business decision-making, we have provided indicative rates that are postage stamp (i.e., every shipper pays the same maximum rate for each molecule) and unadjusted (i.e., does not adjust the maximum tariff rate for any under-recoveries of cost associated with either discounted or negotiated rate capacity that is below the maximum tariff rate).").

[114] *See id.* at B2596, B2604 (Sullivan Dep.).

26

by any reduction in costs incurred by the Subsidiaries."[115]  An additional assumption

was that the Revised Policy would not change in any relevant way.[116]  Baker Botts

then noted:

> The Rate Model Analysis indicates that elimination of an income tax allowance from the cost of service would result in an estimated 12.12% decline in the maximum applicable rate for Texas Gas Transmission, LLC, an estimated 11.68% decline in the maximum applicable rate for Gulf South Pipeline Company, LP, and an estimated 15.62% decline in the maximum applicable rate for Gulf Crossing Pipeline Company LLC.[117]

Next, Baker Botts turned to an interpretation of key terms in the call right.

Relying on our Court's decision in *Norton v. K-Sea Trans. Partners L.P.*, it

explained that key terms in Section 15.1(b) were unambiguous and were better

viewed as "technical terms" with intended "special meaning[s]" that allowed

consideration of extrinsic evidence.[118]  It first considered the phrase "maximum

applicable rate that can be charged to customers by subsidiaries that are regulated

---

[115] App. to DOB at A5125 (Baker Botts Opinion).  The Baker Botts memorandum explained that it relied on "certain of the Partnership's internal assumptions" and that in its review of the financial information with Sullivan, the retained rate expert, "[n]othing came to our attention that indicate [sic] a material error in the Financial Data or that the Partnership had not prepared the Financial Data in good faith."  *Id.* at A4834–36 (Baker Botts Memorandum).

[116] *Id.* at A5126 (Baker Botts Opinion).  The Baker Botts memorandum explained that one basis for this assumption was the fact that "[t]he Revised Policy was adopted after interested parties were given notice and requested to comment on the issue" and that "FERC adopted the Revised Policy after considering the extensive comments it received."  *Id.* at A4835 (Baker Botts Memorandum).  At that stage, "there [was] no formal procedure for requesting revision to the Revised Policy, except in connection with actual rate cases in the future in which the Revised Policy is to be applied."  *Id.*

[117] *Id.* at A5125 (Baker Botts Opinion).

[118] *Id.* at A4837 (Baker Botts Memorandum) (quoting *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013)).

interstate natural gas pipelines of the Partnership."[119]  According to Baker Botts, this phrase should be interpreted "to mean the recourse rates of the Subsidiaries now and in the future as that term is used by the FERC in its regulation, ruling and decisions."[120]  This interpretation focused the opinion on FERC-regulated recourse rates rather than market-informed negotiated and discounted rates.  Its reasoning rested in part on the requirement that attorneys were to provide the opinion rather than "an economist, a rate consultant or maybe an investment banker."[121]  Including the words "maximum" and "can be charged to customers" also cut against a need "to consider actual rates considering actual or expected competitive conditions or other economic factors."[122]  Providing further support for its interpretation was the use of the term "maximum applicable rates" in Boardwalk's securities filings and FERC documents that referred to recourse rates.[123]

Baker Botts then interpreted "'status as an association not taxable as a corporation' to mean status as an entity not taxable as a corporation."[124]  As explained in the memorandum, "for tax purposes, the term 'association' normally refers to a corporation."[125]  Interpreting "association" to mean "entity" helped avoid

---

[119] App. to DOB at A5126 (Baker Botts Opinion).
[120] *Id.*
[121] App. to PAB at B529–30; App. to DOB at A4840 (Baker Botts Memorandum) ("[A] law firm would not be in a position to evaluate what rates would be market clearing rates.").
[122] App. to PAB at B529–30.
[123] *See* App. to DOB at A4840–45 (Baker Botts Memorandum).
[124] *Id.* at A5126 (Baker Botts Opinion).
[125] *See id.* at A4840–45 (Baker Botts Memorandum).

confusion over the underlying issue of Boardwalk's status as an MLP.[126] If "association" did mean "corporation," the memorandum reasoned that "the tax related language in Section 15.1(b)(ii), including 'not taxable as a corporation' and 'not otherwise subject to entity-level tax', would not make sense."[127]

And last, Baker Botts addressed the term "material adverse effect." It considered "an estimated reduction in excess of ten percent in the maximum applicable rates that can be charged to the customers of each of the Subsidiaries on a long-term basis" to meet the threshold.[128] As Baker Botts explained:

> The term "material adverse effect" as used in Section 15.1(b)(ii) of the Partnership Agreement is not defined in the Partnership Agreement or in the Delaware Revised Uniform Limited Partnership Act. In rendering the opinion set forth above, we have considered Delaware case law construing such term. Our analysis leads us to the conclusion that there is no case directly applicable to this situation and no bright-line test regarding what is a "material adverse effect," although the case law has provided us some guidance.[129]

In arriving at the ten percent threshold, Baker Botts reviewed cases Skadden had flagged as important Delaware precedent.[130] It also consulted with Richards Layton & Finger, a Delaware law firm.[131] As Baker Botts explained, "[t]he well-

[126] *See* App. to PAB at B1100; *see also* App. to DOB at A4840 (Baker Botts Memorandum) ("The drafters of Section 15.1(b)(ii) were concerned about a situation that would cause this Partnership's subsidiaries to lose their tax allowance. There would have been no purpose in the drafters of Section 15.1(b)(ii) requiring that all partnerships be affected whether or not they were MLPs.").
[127] App. to DOB at A4838–39 (Baker Botts Memorandum).
[128] *Id.* at A5126 (Baker Botts Opinion).
[129] *Id.* at A5125–26.
[130] *Id.* at A4846 (Baker Botts Memorandum); App. to DRB at AR22.
[131] App. to DOB at A4846 (Baker Botts Memorandum); *see id.* at A5525.

known case law in Delaware interpreting 'material adverse effect' is primarily focused on the use of that term in connection with contracts governing mergers and acquisitions."[132] Recognizing that the context was not the same, Baker Botts also considered how materiality is assessed in other settings.[133] It considered federal securities law, which provides that "something is material if an investor would consider it important in making an investment decision[,]" and noted that "research has established that most accountants view materiality in terms of net income, usually 5% to 10%."[134] The long-term nature of the reduction served as a deciding factor for its recommendation.[135]

H.

The Baker Botts Opinion had to be "acceptable to the General Partner."[136] To address acceptability, Skadden was retained for its expertise in FERC and MLP matters and for its relationship with Loews.[137] Although Skadden had initially been

---

[132] *Id.* at A4846 (Baker Botts Memorandum).

[133] *Id.* at A5126 (Baker Botts Opinion); *id.* at A4853–54 (Baker Botts Memorandum) ("I gave relatively more weight to the merger and acquisition cases, but still gave some consideration to the other cases and accounting literature, since Section 15.1(b) of the LPA is not in a merger and acquisition agreement and provides protection against a specified risk.").

[134] App. to PAB at B531 (March 29 Memorandum); App. to DOB at A4853 (Baker Botts Memorandum); *see id.* at A585–86 (Rosenwasser Tr.).

[135] *Id.* at A4853 (Baker Botts Memorandum) ("It is the fact that the change is long-term that should, in my view, decide the issue when dealing with a 10% or greater amount.").

[136] *Id.* at A3030 (Partnership Agreement § 1.1).

[137] *Id.* at A577 (Rosenwasser Tr.) ("[T]hey had a deep MLP expert, and Grossman and other corporate guys had that expertise. They had a Delaware office and were known as, you know, qualified Delaware counsel. And they had a great FERC practice with Mike Naeve, who was an

retained by the GPGP, after the attorneys concluded that the Sole Member and not the GPGP Board determined acceptability, Skadden shifted its representation to the Sole Member.[138] Skadden first determined which entity at the GPGP level was responsible for accepting the Baker Botts Opinion. Baker Botts had already concluded that the Sole Member should make the determination rather than the GPGP Board.[139] Skadden's task was to "confirm" this.[140] Early deliberations among Skadden lawyers considered possible ambiguity arguments.[141] According to internal emails, while an argument for ambiguity could be made, Skadden eventually found that it was reasonable to conclude the Sole Member had the authority to accept the opinion.[142] Skadden arrived at this conclusion after consultation with Richards Layton & Finger, which relied on the GPGP LLC Agreement and its governance provisions.[143]

---

ex-Commissioner and who was very senior, very experienced in FERC rate matters."); *id.* ("They were to -- in summary, to shadow us and eventually advise the -- Loews and the sole member that our opinion was acceptable."); *id.* at A643 (Alpert Tr.).

[138] *See* App. to DOB at B3451.

[139] App. to PAB at B531–32 (March 29 Memorandum).

[140] App. to DOB at A3730 ("Rich- on another matter, can you check with your corporate MLP specialists, and confirm they view the redemption as the sole decision of the GP—such that the board will not need to act.").

[141] *Id.* at A3750.

[142] *Id.* at A3778; *id.* at A5102 (Skadden Opinion).

[143] App. to PAB at B2457 (Alpert Dep.); *id.* at B1320–23 ("While there is some ambiguity and argument can certainly be made to the contrary, we think that the better view is that the [Acceptability Condition] is within the sole authority of the Sole Member pursuant to Section 5.6 of the LLC Agreement.").

Next, for the acceptability of the opinion itself, Skadden "shadow[ed]" Baker Botts as it prepared its opinion.[144] Skadden refrained from providing specific analysis on the issues Baker Botts addressed and instead framed its review as addressing solely the reasonableness of the analysis and the conclusion.[145]

When the Sole Member Board met on June 29, 2018, Skadden presented its final opinion.[146] As an initial matter, Skadden reviewed its qualifications, Baker Botts' qualifications, and Sullivan's qualifications and noted Baker Botts' consultation with Richards Layton & Finger.[147] Skadden also stated at the outset:

> We believe that it is reasonable for the directors of Boardwalk Holding to conclude that they have the authority . . . to make the determinations called for under Article XV of the LPA, including the exercise of the Call Right and the acceptability of Bakers Botts as counsel and of the Baker Botts Opinion.[148]

The Skadden Opinion then addressed the reasonableness of Baker Botts' assumptions regarding the Revised Policy. Skadden stated it was reasonable to assume the Revised Policy would be applied through regulatory proceedings without relevant changes. It supported this assessment by noting that FERC had already sought and considered comments on the issue; that the Revised Policy was in

---

[144] App. to DOB at A577 (Rosenwasser Tr.).
[145] *Id.* at A5121 (Skadden Opinion) ("[W]e have not been asked to undertake, and have not undertaken, any analyses for purposes of rendering the Opinion of Counsel contemplated in Section 15.1(b)(ii) of the LPA (and are not rendering such an opinion) . . . .").
[146] *Id.* at A5081–84; *id.* at A5100–22.
[147] *Id.* at A5100–22.
[148] *Id.* at A5102.

response to the D.C. Circuit's remand order in *United Airlines* that left FERC "no choice" on the matter; and that other MLP pipeline entities had begun "restructurings demonstrating an apparent conviction that the Revised Policy Statement will continue to apply."[149]  It concluded that "notwithstanding efforts by the Partnership and others to persuade the FERC to abandon or modify the revised policy, we think it is reasonable for Baker Botts to assume the new FERC policy will continue to apply."[150]

Skadden then confirmed the reasonableness of the definitions Baker Botts had applied to key terms.  It concluded that Baker Bott's interpretation of "maximum applicable rate" to mean recourse rates was reasonable because of similar language in Boardwalk's public filings and FERC's use of the term.[151]

The meaning of "material adverse effect" received specific attention. Skadden first reviewed Baker Botts' analytical process, noting that Baker Botts had considered Delaware case law and consulted Delaware counsel on the matter.[152]  It then highlighted that Boardwalk "is likely the only MLP that has a provision similar to Section 15.1(b), requiring an opinion of counsel regarding a material adverse effect on . . . maximum applicable rate[s]."[153]  Thus, it was reasonable for Baker

---

[149] *Id.* at A5117.
[150] *Id.*
[151] *Id.* at A5119.
[152] *Id.* at A5120.
[153] *Id.*

33

Botts to conclude it was writing on a clean slate.[154] According to Skadden, Baker Bott's reliance on financial data to assess a material adverse effect was also reasonable "as it b[ore] on potential changes in each interstate pipeline's maximum applicable rate[.]"[155] While not rendering an opinion on whether there was a material adverse effect, Skadden concluded that the "general processes and analyses described in the Baker Botts Opinion . . . are reasonable."[156]

In the end, Skadden advised the Sole Member Board: "[w]e believe that, based on the factors and considerations outlined herein, it would be within the reasonable judgment of Boardwalk Holding to find that Baker Botts is acceptable counsel and that the Baker Botts Opinion is acceptable, as that term is used in the LPA."[157]

Following Skadden's advice, the Sole Member Board determined that the Baker Botts Opinion was acceptable and directed the General Partner to exercise the call right.[158] Boardwalk announced the decision later that day, which meant that it would purchase the units at a price of $12.06 per common unit, approximately $1.5 billion in total.[159] The transaction closed on July 18, 2018.[160]

---

[154] Id.
[155] Id.
[156] Id. at A5121.
[157] Id. at A5122.
[158] App. to DOB at A5086–87 (Sole Member Board Meeting Minutes).
[159] App. to PAB at B180 (PTO).
[160] Id. at B180.

The next day, on July 19, 2018, FERC issued an order on rehearing of the Revised Policy and a final rule on the NOPR.[161]  The order on rehearing stated that MLPs would not automatically be entitled to an income tax allowance but could argue that they were entitled to one based on the record in their case.[162]  FERC's final rule also said that if MLPs were stripped of their income tax allowance, they could eliminate their ADIT balances.[163]  Other pipelines and industry associations had argued for this result, and FERC based its ruling in part on these arguments.[164] For Boardwalk, this meant there would be no immediate effect on recourse rates. There is no evidence that anyone involved had any advance notice about the substance of the July 19, 2018 order or FERC's final rule.

J.

On May 24, 2018, two holders of common units – the initial plaintiffs – filed suit in response to Boardwalk's and Loews' disclosure that they were considering exercise of the call right.[165]  The news caused the price of Boardwalk units to decline

---

[161] App. to DOB at A5391–400 (FERC Order on Rehearing), *id.* at A5189–5390 (FERC Final Rule).

[162] *Id.* at A5392 (FERC Order on Rehearing) ("An entity such as an MLP pipeline will not be precluded in a future proceeding from arguing and providing evidentiary support that it is entitled to an income tax allowance and demonstrating that its recovery of an income tax allowance does not result in a double-recovery of investors' income tax costs.").

[163] *Id.* at A5275–76 (FERC Final Rule).

[164] *Id.* at A5217, A5274; *id.* at A5391 (FERC Order on Rehearing).

[165] App. to PAB at B1296–98, B1304 (Form 10-Q); *id.* at B122–23 (PTO).

– a benefit to Loews due to the call right's pricing being based on a trailing market average.[166] To limit the impact of the disclosures on the unit price, the parties entered settlement negotiations and agreed in principle to a settlement with an exercise date on or before June 29, 2018, reducing the negative price impact of the call right exercise announcement to forty-four days post-disclosure.[167]

The current Bandera plaintiffs objected to the proposed settlement as inadequate, and the Court of Chancery declined to approve it.[168] They took over the litigation from the initial plaintiffs and filed an amended class action complaint on October 14, 2020.[169] In the amended complaint, Bandera first alleged that Boardwalk and the General Partner had breached the Partnership Agreement through their exercise of the Section 15.1(b) call right without meeting the Opinion of Counsel requirements.[170] A second breach of contract claim alleged that Boardwalk and the General Partner breached the Partnership Agreement by paying a deflated price per unit upon exercise of the call right.[171] Bandera alleged alternatively that

---

[166] *See id.* at B1339 (Deutsche Bank Research Bulletin) ("Stakeholders could expect no higher price for shares of BWP than $11.50 unless Loews chose voluntarily to tender at a higher share price (or chose not exercise at all). Given that the probable "best" the stakeholders could do seemed to be around $11.50 in August 2017, there seemed to be little incentive to hold onto BWP shares above that price. And so the stock has begun to fall. However, as the stock falls, so too does the 180-average price for which Loews can demand tender.").

[167] App to DOB at A5437–43; *id.* at A661 (Alpert Tr.).

[168] *Id.* at A236; *id.* at A233.

[169] *See id.* at A236; *id.* at A356.

[170] *Id.* at A549–53.

[171] *Id.* at A553–55.

Boardwalk and the General Partner had breached the implied covenant of good faith and fair dealing by causing a decline in the price of Boardwalk units and then paying only $12.06 per unit.[172]  Finally, Bandera alleged tortious interference and unjust enrichment claims against the GPGP, the Sole Member, and Loews.[173]

K.

The Court of Chancery held a four-day trial.[174]  The central questions were whether the General Partner had breached the Partnership Agreement when it exercised the call right, and if so, whether the defendants were exculpated from damages under the Partnership Agreement, and if not, the damages caused by the improper exercise of the call right.

The court ruled that the General Partner had not received "a *bona fide* 'Opinion of Counsel' that could satisfy the Opinion Condition."[175]  This was, according to the court, because "the Opinion did not reflect a good faith effort to discern the actual facts and apply professional judgment."[176]  The court pointed to a series of what it characterized as unsupported counterfactual assumptions and a misleading Rate Model Analysis as part of an effort by Baker Botts and Boardwalk

---

[172] *Id.* at A555–57.
[173] *Id.* at A557–59.
[174] *Id.* at A562–871.
[175] *Bandera*, 2021 WL 5267734, at *52.
[176] *Id.* at *55.

to set up a biased analytical framework.[177]  It then criticized Baker Botts' strained interpretation of key terms within that framework as evidence of "motivated reasoning" that resulted in a "flawed imitation" of an opinion.[178]  The court concluded "[t]he Opinion was a contrived effort to reach the result that the General Partner wanted."[179]

The Court of Chancery next addressed whether the General Partner had properly accepted the opinion.  It found the language of the Partnership Agreement ambiguous as to whether the Sole Member or the GPGP Board made the decision to accept the Opinion of Counsel.[180]  Although the court recognized that the Sole Member as decisionmaker had greater textual support, this interpretation, the court found, would render the acceptability requirement surplusage by negating the apparent protection it offered to limited partners.[181]  Also, according to the court, the LLC Agreement delegated management responsibilities to the GPGP Board, and the

---

[177] *Id.* at *67, *71.  The court took issue with assumptions that the Revised Policy was final, that recourse rates would change without a rate case, that hypothetical indicative rates are the same as recourse rates, and that FERC would treat ADIT a certain way.  *See id.* at *55–63.  The court also viewed the connection between the tax allowance and rates underlying the Rate Model Analysis as overly simplified.  *See id.* at *64.  As a result, the Rate Model Analysis "departed from ratemaking principles" and, in the court's view, "avoided any meaningful assessment of how, if at all, a change in the cost of service might impact any of" Boardwalk's recourse rates.  *See id.* at *65.  The court's criticism stems from the fact that Boardwalk's model did not replicate the complex and intensive process of a rate case, which, should one be initiated, would consider demand-side adjustments across various geographic zones before setting recourse rates rather than focusing solely on costs.  *Id.* at *65–66.

[178] *Id.* at *67–71.

[179] *Id.* at *55; *see id.* at *71.

[180] *Id.* at *78.

[181] *Id.* at *74.

acceptability requirement was more closely related to the management of the partnership. [182]   Finding both readings reasonable, the court applied *contra proferentem* – interpreting the agreements against the drafter – and concluded that the GPGP Board and not the Sole Member should have determined acceptability of the Baker Botts Opinion.[183]  The court believed this outcome "meshe[d] better with the overall structure of the agreements" despite having "fewer textual supports" than the reading granting the Sole Member acceptance authority.[184]

The Court of Chancery then turned to whether the Partnership Agreement exculpated the defendants from damages.  Two provisions were relevant: the Exculpation Provision in Section 7.8(a) and the Reliance Provision in Section 7.10(b).[185]  Section 7.8(a) shielded the General Partner from monetary liability absent fraud, bad faith, or willful misconduct.[186]  Boardwalk argued that the willful misconduct must rest with the Sole Member Board—Siegel, Keegan, and Wang—

---

[182] *Id.* at *76.

[183] *Id.* at *78 ("Because the question of who could make the acceptability determination was ambiguous, well-settled interpretive principles require that the court construe the agreement in favor of the limited partners. . . . Because the GPGP Board did not make the acceptability determination, the General Partner breached the Partnership Agreement by exercising the Call Right."); *id.* at *71 ("Both readings are reasonable.").

[184] *Id.* at *71.

[185] App. to DOB at A3090, A3092 (Partnership Agreement §§ 7.8(a), 7.10(b)).

[186] *Id.* at A3090 (Partnership Agreement § 7.8(a)) (exculpating the General Partner unless there has been a finding that it "acted in bad faith or engaged in fraud, willful misconduct, or, in the case of a criminal matter, acted with knowledge that [its] conduct was criminal").

39

and that a showing of *scienter* was necessary for all three individuals.[187] The court was not persuaded by this argument because, according to the court, the plaintiffs were seeking to recover from the General Partner rather than from those individuals.[188] Further, the court pointed to "[a] basic tenet of corporate law, derived from principles of agency law, . . . that the knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself."[189] The court found that Alpert, Siegel, McMahon, and Johnson, as agents of Loews, the Sole Member, the GPGP, the General Partner, and Boardwalk, acted "in a manner sufficient to impute *scienter* to the General Partner."[190] The court also pointed to Baker Botts' knowledge, and held that a "lawyer's knowledge is imputed to the client for matters within the scope of the lawyer's agency."[191] Because the General Partner pushed Baker Botts to provide the opinion that it wanted, the court found, Baker Botts' *scienter* could be imputed to

---

[187] *Bandera*, 2021 WL 5267734, at *79 ("[T]he defendants argue that the court must (i) focus on the three individuals who comprised the Holdings board (Siegel, Keegan, and Wang), (ii) examine their individual states of mind when deciding to exercise the Call Right, and (iii) deny any recovery to the class unless all three acted with *scienter*.").

[188] *Id.* at *80.

[189] *Id.* (quoting *Stewart v. Wilm. Tr. SP Servs., Inc.*, 112 A.3d 271, 302–03 (Del. Ch. 2015), *aff'd*, 126 A.3d 1115 (Del. 2015); then citing *Teachers' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006); and finally citing Restatement (Third) of Agency § 5.03 Westlaw (Am. L. Inst. database updated Oct. 2021)).

[190] *Bandera*, 2021 WL 5267734, at *80; *see also id.* ("[They] orchestrated the sham Opinion, supported the sham Opinion with the inadequate Rate Model Analysis, and diverted the acceptability determination for the sham Opinion from the GPGP Board to Holdings.").

[191] *Id.*

the General Partner. Imputing willful misconduct to the General Partner "render[ed] the exculpatory provision inapplicable."[192]

Under Section 7.10(b) of the Partnership Agreement, the General Partner was conclusively presumed to act in good faith if it took an action in reliance on the advice or opinion of legal counsel.[193] The Court of Chancery found that the General Partner did not rely on the Baker Botts Opinion because it knew "that the opinion in question was contrived to generate a result."[194] It also could not rely on the Skadden Opinion to escape liability.[195] First, the court held, it was unclear whether the General Partner could use a secondary opinion to cover up the flaws in the first opinion.[196] Second, the issues with reliance still held, according to the court, because the General Partner was not actually relying on the Skadden Opinion, but rather "manufactur[ing] the [first] opinion and then get[ting] another opinion to whitewash the first one."[197] Finally, the court ruled that, even if the General Partner relied on the Skadden Opinion, the wrong decisionmaker made the acceptability determination. Thus, the court held, the General Partner did not "validly [rely] on Skadden's advice."[198]

[192] Id.
[193] App. to DOB at A3092 (Partnership Agreement § 7.10(b)).
[194] Bandera, 2021 WL 5267734, at *81.
[195] Id.
[196] Id.
[197] Id.
[198] Id.

The Court of Chancery awarded $689,827,343.38 in damages, pre- and post-judgment interest on that amount, and an award of fees.[199]

## II.

A Delaware master limited partnership "allow[s] sponsors and public investors to take advantage of favorable tax laws" with the "benefit under Delaware law [of] the ability to eliminate common law duties in favor of contractual ones, thereby restricting disputes to the four corners of the limited partnership agreement."[200] Section 17-1101(f) of the Delaware Revised Uniform Limited Partnership Act (the "DRULPA") allows a partnership to eliminate "any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a partner or other person to a limited partnership or to another partner or to another person that is a party to or is otherwise bound by a partnership agreement" other than for "any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing."[201]

Delaware courts respect the terms of a partnership's governing agreements to preserve the "maximum flexibility" of contract.[202] Our strict approach to contract

---

[199] *Id.* at *82.
[200] *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 245 (2017).
[201] 6 *Del. C.* § 17-1101.
[202] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 170 (Del. 2002) (quoting *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999)); *see* 6 *Del. C.* § 17-1101(c) (The "policy" of the DRULPA is "to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements.").

interpretation and enforcement "puts investors on notice" regarding the primacy of partnership agreements "and therefore that investors should be careful to read partnership agreements before buying units."[203]

It is common for MLP sponsors to "[take] advantage of DRULPA's flexibility" to concentrate power in the general partner, to limit liabilities, and to waive fiduciary duties.[204] A consequence is that MLPs "severely limit[] the limited partners' ability to challenge or change the general partner's management of the MLP's business."[205] Within a limited partnership, "[g]eneral partners and limited partners invariably have different governance rights,"[206] and "severe consolidation of governing power in the general partner is standard."[207] The customizability of governance structures and business relationships in this way might be one reason for the popularity of MLPs.[208]

---

[203] *Miller v. Am. Real Est. P'rs, L.P.*, 2001 WL 1045643, at *8 (Del. Ch. Sept. 6, 2001).
[204] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 100 (Del. 2013); *Dieckman v. Regency GP LP*, 155 A.3d 358, 366 (Del. 2017) ("One freedom often exercised in the MLP context is eliminating any fiduciary duties a partner owes to others in the partnership structure"); John Goodgame, *Master Limited Partnership Governance*, 60 Bus. Law. 471, 491 (2005) [hereinafter *Goodgame*] ("One noncorporate quality of almost every MLP is the degree of control exercised by the general partner and the exclusion of the common unitholders from much, if not all, control."); Sandra K. Miller & Karie Davis-Nozemack, *Toward Consistent Fiduciary Duties for Publicly Traded Entities*, 68 Fla. L. Rev. 263, 271 (2016) ("MLP agreements are often drafted to maximize the GP's control and to minimize the limited partners' remedies.").
[205] *Goodgame*, at 493.
[206] *Bamford v. Penfold, L.P.*, 2020 WL 967942, at *17 (Del. Ch. Feb. 28, 2020).
[207] *Goodgame*, at 491.
[208] *Sonet v. Timber Co., L.P.*, 722 A.2d 319, 323 (Del. Ch. 1998) ("One might reasonably conclude that the statutory authority granted to limited partnerships to contract around—or to enhance—fiduciary duties goes a long way in explaining this popularity.").

Boardwalk made full use of the MLP structure to limit fiduciary duties and to consolidate governing power in its general partner. Section 7.1(a) of the Partnership Agreement allowed the General Partner "to do all things and on such terms as it determines to be necessary or appropriate to conduct the business of the Partnership" and provided a non-exhaustive list of decisions over which the General Partner has "full power and authority."[209] Consolidation continues up Boardwalk's chain of control as shown by Section 5.6 of the LLC Agreement that grants the Sole Member "exclusive authority" over important General Partner decisions.[210]

Further, Section 7.1(b) frees the General Partner and its controlling entities from "any duty that the General Partner may owe the Partnership or Limited Partners . . . or any duty stated or implied by law or equity" in its performance of the Partnership Agreement.[211] Section 7.9 sets forth the standards of conduct and duties that do apply. Section 7.9(b) explains that actions by the General Partner "in its capacity as the general partner . . . as opposed to in its individual capacity" are only subject to a duty of good faith, a defined duty that requires an action to be taken under the "belie[f] that the determination or action is in the best interests of the Partnership."[212] On the other hand, under Section 7.9(c), the General Partner can

---

[209] App. to DOB at A3082–84 (Partnership Agreement § 7.1(a)). The Section 7.1(a) list covers topics such as securities issuances, cash distributions, and agreements with affiliates. *Id.*
[210] App. to DOB at A1317–18 (LLC Agreement § 5.6).
[211] App. to DOB at A3084 (Partnership Agreement § 7.1(b)).
[212] *Id.* at A3091 (Partnership Agreement § 7.9(b)).

take individual capacity decisions "free of any fiduciary duty or obligation whatsoever to the Partnership" and without a requirement to act in good faith.[213] For further clarity, Section 7.9(e) reiterates that the General Partner is subject to no duties or obligations "[e]xcept as expressly set forth in this Agreement."[214]

The Court of Chancery has noted that "the doctrine of caveat emptor . . . is fitting given that investors in limited partnerships have countless other investment opportunities available to them that involve less risk and/or more legal protection."[215] Our Court echoed this sentiment in *Norton* and highlighted that the plaintiff "willingly invested in a limited partnership that provided fewer protections to limited partners than those provided under corporate fiduciary duty principles."[216] In that case, we found that the plaintiff was "bound by his investment decision."[217] More recently in *Dieckman v. Regency GP LP*, this Court again warned of the sponsor-friendly nature of typical MLP agreements:

> With the contractual freedom accorded partnership agreement drafters, and the typical lack of competitive negotiations over agreement terms, come corresponding responsibilities on the part of investors to read carefully and understand their investment. Investors must appreciate that "with the benefits of investing in alternative entities often comes the limitation of looking to the contract as the exclusive source of protective rights." In other words, investors can no longer hold the general partner to fiduciary standards of conduct, but instead must rely on the express language of the partnership agreement to sort out the

---

[213] *Id.* at A3091–92 (Partnership Agreement § 7.9(c)).
[214] *Id.* at A3092 (Partnership Agreement § 7.9(e)).
[215] *Sonet*, 722 A.2d at 323.
[216] *Norton*, 67 A.3d at 368.
[217] *Id.*

45

rights and obligations among the general partner, the partnership, and the limited partner investors.[218]

The sale of MLP units on a public exchange requires an MLP to comply with the filing requirements of securities laws. A section covering the risks of a particular investment is a standard part of a prospectus and regular filings.[219] As noted earlier, Boardwalk used these filings to highlight the concentration of power in the general partner and how the call right could be exercised to the disadvantage of the public investors.

## III.

Before the General Partner could take Boardwalk private, the General Partner had to receive "an Opinion of Counsel that the Partnership's status as an association not taxable as a corporation and not otherwise subject to an entity-level tax for federal, state and local income tax purposes has or will reasonably likely in the future have a material adverse effect on the maximum applicable rate that can be charged to customers."[220] The Partnership Agreement defined "Opinion of Counsel" as "a written opinion of counsel acceptable to the General Partner."[221]

If the General Partner breached the Partnership Agreement, under Section 7.8(a) the General Partner would not be "liable for monetary damages . . . unless

---

[218] *Dieckman*, 155 A.3d at 366.
[219] *Goodgame*, at 506.
[220] App. to DOB at A3117 (Partnership Agreement § 15.1(b)).
[221] *Id.* at A3030 (Partnership Agreement § 1.1).

46

there [was] a final and non-appealable judgment" that it "acted in bad faith or engaged in fraud [or] willful misconduct."[222]  Relatedly, Section 7.10(b) provides that the General Partner is "conclusively presumed" to have acted in good faith when it relies on advice of counsel "as to matters the General Partner believes to be within [counsel's] professional or expert competence."[223]  In other words, when the General Partner acts in reliance on advice from competent counsel, it is conclusively presumed to have acted in good faith and is exculpated from damages.

The General Partner received an opinion from Baker Botts that Section 15.1(b)'s call right conditions had been satisfied, and that the General Partner could repurchase the public units.  Skadden gave an opinion to the Sole Member Board – the Board it advised was the proper decisionmaker to determine acceptability – that "based on the factors and considerations outlined [in Skadden's Board presentation], it would be within the reasonable judgment of [the Sole Member Board] to find that Baker Botts is acceptable counsel and that the Baker Botts Opinion is acceptable, as that term is used in the [Partnership Agreement]."[224]

The Court of Chancery found that the General Partner breached the Partnership Agreement by exercising the call right.  According to the court, Baker Botts offered a contrived opinion that failed to satisfy the Opinion Condition.

---

[222] *Id.* at A3090 (Partnership Agreement § 7.8(a)).
[223] *Id.* at A3092 (Partnership Agreement § 7.10(b)).
[224] *Id.* at A5122 (Skadden Opinion).

Because the General Partner acted "intentionally and opportunistically" in securing the opinion, its breach constituted willful misconduct.[225] As the court held, knowing participation in securing the contrived opinion also meant the General Partner could not rely on the Baker Botts Opinion and the conclusive presumption that followed from such reliance.[226] The court also held that the General Partner failed to satisfy the Acceptability Condition, because the Sole Member and not the GPGP Board made the determination.

On appeal, the Boardwalk entities argue that even if the Court of Chancery rejected the Baker Botts Opinion, the General Partner nonetheless relied in good faith on the Skadden Opinion, both in identifying the acceptability decisionmaker and in expressing its opinion that it was reasonable for the Sole Member Board to determine that the Baker Botts Opinion was acceptable. As they argue, the General Partner acted through the Sole Member and was the ultimate beneficiary of Skadden's advice. Importantly, the Court of Chancery did not find, nor did Bandera contend, that the Skadden Opinion was the product of bad faith or willful misconduct. Thus, according to the Boardwalk defendants, the General Partner was presumed to have acted in good faith and is exculpated from damages.

---

[225] *Bandera*, 2021 WL 5267734, at *3.
[226] *Id.*

We address the proper decisionmaker and exculpation arguments in turn. In considering the arguments on appeal, "[w]e review questions of law and contractual interpretation . . . *de novo*."[227] "We defer to the Court of Chancery's factual findings supported by the record" and review them for clear error.[228]

## A.

Under the Partnership Agreement, an Opinion of Counsel had to be acceptable to the General Partner. The Partnership Agreement did not address the details of how the General Partner would make the determination. Based on this perceived gap, the Court of Chancery found that "[a] limited partner . . . could not readily determine from the Partnership Agreement who would make the acceptability determination on behalf of the General Partner" and that the Partnership Agreement was therefore ambiguous.[229] The court also found that, even if the court looked to the GPGP's LLC Agreement to answer the question, "the LLC Agreement also does not clearly address what decisionmaker would make the acceptability determination."[230] Given the perceived ambiguity and what the court believed was the need to interpret the LLC Agreement in an investor-friendly way, the court concluded that the Baker Botts Opinion was contrived because, among other things,

---

[227] *CompoSecure, L.L.C. v. CardUX, LLC*, 206 A.3d 807, 816 (Del. 2018); *see also AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC*, 268 A.3d 198, 209 (Del. 2021).

[228] *AB Stable VIII LLC*, 268 A.3d at 209 (quoting *Heartland Payment Sys., LLC v. Inteam Assocs., LLC*, 171 A.3d 544, 557 (Del. 2017)); *CompoSecure, L.L.C.,* 206 A.3d at 816.

[229] *Bandera*, 2021 WL 5267734, at *72.

[230] *Id.* at *73.

49

the law firm steered the acceptability determination away from the GPGP Board and towards the more receptive Sole Member and its board.

Our disagreement with the Court of Chancery begins with its assumption that the Partnership Agreement's silence about the mechanics of the General Partner's acceptability review means an ambiguity existed in the Partnership Agreement. The Partnership Agreement placed the acceptability determination in the hands of the General Partner. Having directed the acceptability determination to the General Partner, the LLC Agreement dictated how it was to make the acceptability determination.

In our view, the Court of Chancery's analysis went off track when the court read the Partnership Agreement in isolation and not as part of the MLP's overall governance structure. An MLP can be organized as a limited partnership managed by a general partner that is often ultimately controlled by a limited liability company. The governing agreements – the Partnership Agreement and the LLC Agreement – were both disclosed to investors in the offering documents.[231] This makes sense as both agreements work together to spell out how the General Partner managed Boardwalk.[232]

---

[231] *See, e.g.*, App. to DOB at A1660–61 (Form S-1 Registration Statement); *id.* at A2036 (Amend. No. 4 to S-1); *id.* at A2573–74 (Amend. No. 5 to S-1); *id.* at A3392 (2017 Form 10-K).
[232] *See Urdan v. WR Cap. P'rs, LLC*, 244 A.3d 668, 674–75 (Del. 2020) (reading separate agreements together when there is evidence "that might imply an intent to treat [them] as a unitary transaction"). In addition to the reference to governing documents in Section 7.9(c), both

For instance, the Partnership Agreement directs attention to the "General Partner's organizational documents" – of which the LLC Agreement is a part – to ascertain who at the General Partner decides whether to take action when the General Partner exercises its individual as opposed to general managerial authority.[233] The call right exercise, being an individual capacity determination, directly implicates the LLC Agreement.[234] The LLC Agreement also has many other provisions addressing how the General Partner exercises its authority under the Partnership Agreement.[235] It would have been redundant to spell out in the Partnership Agreement how the General Partner executed its partnership authority – the

---

instruments came into force in 2005 for Boardwalk's initial public offering and were by and between affiliated entities. App. to DOB at A1327–28 (Initial Prospectus); *id.* at A1306 (LLC Agreement § 1.1); *id.* at A1299, A2482, A2554.

[233] App. to DOB at A3091–92 (Partnership Agreement § 7.9(c)) ("The General Partner's organizational documents may provide that determinations to take or decline to take any action in its individual, rather than representative, capacity may or shall be determined by . . . the members or stockholders of the General Partner's general partner, if the General Partner is a limited partnership.").

[234] Section 7.9(c) of the Partnership Agreement states "[b]y way of illustration and not of limitation, whenever the phrase, 'at the option of the General Partner,' or some variation of that phrase, is used in this Agreement, it indicates that the General Partner is acting in its individual capacity." *Id.* at A3091 (Partnership Agreement § 7.9(c)). The Call Right states that it is "exercisable at [the General Partner's] option." *Id.* at A3117 (Partnership Agreement § 15.1(b)). Given this "signaling language," the Court of Chancery acknowledged that "the decision whether to exercise the Call Right is a decision that the General Partner makes in its individual capacity." *Bandera*, 2021 WL 5267734, at *72.

[235] *See, e.g.*, App. to DOB at A1316 (LLC Agreement § 5.6) (granting the GPGP Board authority in accordance with the restrictions of the Partnership Agreement); *id.* (requiring Sole Member approval of an amendment to the Partnership Agreement through Section 10.5); *id.* at A1317 (LLC Agreement § 5.6(iii)) (giving the Sole Member exclusive authority over General Partner's decision to make additional capital contributions to Boardwalk per Section 5.2(b) of the Partnership Agreement); *id.* at A1317 (LLC Agreement § 5.6(vi)) (conferring on the Sole Member exclusive authority over General Partner's decision to make certain loans per Section 7.6(a) of the Partnership Agreement).

mechanics were set forth in the LLC Agreement. Further, when the Partnership Agreement drafters assigned specific matters to the GPGP Board, they did so expressly.[236] Absent a specific direction in the Partnership Agreement about how the General Partner exercised its authority, it was a matter for the General Partner and its internal governance according to the LLC Agreement.

Turning to the LLC Agreement, the drafters divided managerial responsibilities between the GPGP Board and the Sole Member. Section 5.2 of the LLC Agreement gave the GPGP Board general authority to exercise the business and affairs of the GPGP.[237] But Section 5.6 contained extensive carveouts to that general managerial authority.[238] Of relevance here is the "exclusive authority" of the Sole Member "over the business and affairs of the Company that do not relate to the management and control of the MLP."[239] Under this Section, the Sole Member had "exclusive authority to cause the Company to exercise the rights of the Company and those of the MLP General Partner, as general partner of the MLP."[240] The

---

[236] *See, e.g.*, App. to DOB at A3061 (Partnership Agreement § 5.11(f)) (assigning responsibility to the GPGP Board over determining fair market value of common units in connection with an exchange or tender offer); *id.* at A3090–91 (Partnership Agreement § 7.9(a)) (assigning role to the GPGP Board in resolution of conflicts of interest).

[237] *Id.* at A1313–14 (LLC Agreement § 5.2).

[238] *Id.* at A1315–18 (LLC Agreement § 5.6).

[239] *Id.* at A1316 (LLC Agreement § 5.6).

[240] *Id.* at A1316–18 (LLC Agreement § 5.6). Section 5.6 also states that "the type of matter" falling under the Sole Member's "exclusive authority" includes repurchases of any equity in the General Partner or GPGP, emphasizing an overall scheme to consolidate decision-making in Boardwalk's controlling entity. *Id.* at A1316.

Section listed eleven references to sections of the Partnership Agreement – one of which is "Section 15.1 ('*Right to Acquire Limited Partner Interests*')."[241] In other words, the Sole Member, acting for the General Partner in its individual capacity and free from fiduciary duties, had the "exclusive authority to cause" the General Partner to exercise the call right and to acquire all outstanding limited partnership interests.[242]

An integral part of the General Partner's "exclusive authority to cause" the call right exercise was obtaining an opinion of counsel acceptable to the General Partner. As the Court of Chancery noted, "[i]f the Opinion was not acceptable, then the Acceptability Condition could not be met and the General Partner could not exercise the Call Right."[243] The possibility that the GPGP Board could find the opinion unacceptable and then obstruct the exercise of the call right is at odds with the Sole Member having "exclusive authority to cause" the exercise of the call right.

Two further points dispel any surprise or doubt that the Sole Member was to determine the acceptability of the Opinion of Counsel. First, Boardwalk's public disclosures stated that "[a]ctions of [its] general partner, which are made in its

---

[241] *Id.* at A1317–18 (LLC Agreement § 5.6).
[242] The Court of Chancery observed that including the exclusive authority provision hinted at the underlying ambiguity over the correct decisionmaker. *Bandera*, 2021 WL 5267734, at *72. ("[W]ithout the Authority Provision it would be unclear whether the decision to exercise the Call Right fell within the purview of the GPGP Board or Holdings."). We do not see how including a provision addressing an issue leads to evidence of ambiguity.
[243] *Bandera*, 2021 WL 5267734, at *70.

individual capacity, will be made by [Holdings], the sole member of [the GPGP], rather than by [the GPGP] Board" and noted multiple times that the call right exercise was an individual capacity matter.[244]  There is no mention of separate treatment of the Acceptability Condition.[245]  That the filings do not treat the acceptability determination as distinct from the exercise "provides helpful context regarding what [Boardwalk] contemplated . . . and what the public unitholders accepted by purchasing" their units.[246]  And second, and perhaps conclusively, in the LLC Agreement, "Opinion of Counsel" was defined as "a written opinion of counsel . . . acceptable to the Sole Member."[247]

B.

We respectfully disagree with the Court of Chancery's reasons supporting its ambiguity finding.  First, the court acknowledged that the opinion of counsel definition in the LLC Agreement – "a written opinion of counsel . . . acceptable to the Sole Member" – provided textual support for the Sole Member to make the acceptability determination.  But the court dismissed the opinion of counsel

---

[244] App. to DOB at A2987 (2006 Form 10-K); *id.* at A2695, A2703, A2719 (Final Prospectus).
[245] *See id.* at A2596 (Final Prospectus) (stating the call right may be exercised "if [the] general partner receives an opinion of outside counsel" but excluding mention of an acceptability determination).
[246] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 191 (Del. Ch. 2014).
[247] App. to DOB at A1309 (LLC Agreement § 1.1).

definition as a "stray definition" because the drafters did not use the term "opinion of counsel" in other sections of the LLC Agreement.[248]

If the opinion of counsel definition was a stray definition devoid of meaning, however, it would more likely have read "opinion of counsel acceptable to the GPGP Board" – the entity having general management responsibilities over the General Partner. But the drafters identified the Sole Member as the entity determining acceptability. In keeping with our duty to give meaning to agreement terms whenever possible, and reading the agreements together, we conclude that the drafters more likely chose "acceptable to the Sole Member" and not the GPGP Board to reinforce that, when it came to the acceptability of an Opinion of Counsel for the call right exercise, the Sole Member and not the GPGP Board controlled all aspects of the General Partner's call right exercise.[249]

Second, the court found that the acceptability determination was a better fit under "the management and control" of the GPGP LLP. According to the court, corporate law principles would consider a going private transaction part of the

---

[248] *Bandera*, 2021 WL 5267734, at *73. The court did agree that a reading in favor of the Sole Member as decisionmaker "had the added benefit of giving some purpose to the" otherwise "stray definition." *Id.*

[249] *See Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) ("The contract must also be read as a whole, giving meaning to each term . . . ."); *Martin Marietta Mat'ls, Inc. v. Vulcan Mat'ls Co.*, 68 A.3d 1208, 1225 (Del. 2012) (proper interpretation "compelled . . . by the canon of construction that requires all contract provisions to be harmonized and given effect where possible").

business and affairs of the corporation.[250] But that analogy divorces the acceptability determination from the call right exercise. Section 5.6 confers exclusive authority on the Sole Member to "cause" the General Partner to exercise the call right under Section 15.1 of the Partnership Agreement.[251] The acceptability determination is both incorporated into Section 15.1 and is a necessary condition to exercising the call right – a right that falls within the Sole Member's "exclusive" authority to "cause" the exercise of the call right.[252] Detaching the Acceptability Condition from the Opinion Condition as the Court of Chancery suggests would make the Sole Member's exclusive authority non-exclusive and would equate causing the exercise with the exercise itself.[253]

Third, the court reasoned that, under the Partnership Agreement, the acceptability determination and the call right exercise had to be made separately by the GPGP Board and the Sole Member, respectively. Otherwise, according to the court, there would be surplusage in the Partnership Agreement as the Sole Member "always had the ability to make a de facto acceptability determination" by not

---

[250] *Bandera*, 2021 WL 5267734, at *76.
[251] App. to DOB at A1315–18 (LLC Agreement § 5.6).
[252] *See Borealis Power Hldgs. Inc. v. Hunt Strategic Util. Inv., L.L.C.*, 233 A.3d 1, 11 (Del. 2020) (Vaughn and Montgomery-Reeves, JJ., concurring) (incorporating defined term into contractual provision to "ma[ke] [it] a part thereof as if set forth therein").
[253] The Court of Chancery found that because the acceptability determination is a condition that must be satisfied before the right to exercise the call right arises, it is wholly distinct from the decision to exercise the call right. *Bandera*, 2021 WL 5267734, at *75. But the acceptability determination precondition is why it should be encompassed within the exclusive authority of the Sole Member to "cause" the exercise of the call right.

exercising the call right.[254] To avoid the acceptability determination "serving as a redundant condition," the Court of Chancery believed that it "exist[ed] to protect the Partnership" by "ensur[ing] that the General Partner cannot obtain a contrived opinion."[255] The GPGP Board, having four independent members, could thus serve as a protective check, giving it, in the Court of Chancery's view, responsibility for the acceptability determination.[256]

But the fact that the GPGP Board had four independent directors was by happenstance rather than a feature dictated by the LLC Agreement, which only requires three out of a maximum of eight directors of the GPGP Board to be independent.[257] Thus, the court's interpretation lacks textual support and creates

---

[254] *Bandera*, 2021 WL 5267734, at *74.

[255] *Id.*

[256] *Id.* ("[T]he acceptability determination logically belongs to the GPGP Board. Only the GPGP Board has outside directors, and only the GPGP Board can inject a measure of independence into the determination of acceptability."). To add further support for its interpretation that the Acceptability Condition protected the limited partners, the Court of Chancery pointed to the call right provision in Section 15.1(a) that the General Partner could exercise without an Opinion of Counsel if it owned 80% of the outstanding units. *Id.* The court reasoned that "[t]he difference between the two call rights indicates that the Opinion Condition and the Acceptability Condition were intended as meaningful limitations on the General Partner's ability to exercise the Call Right at the lower ownership level." *Id.* But this overlooks the fact that an Opinion of Counsel is itself a meaningful limitation regardless of who accepts it. *See Gerber v. Enter Prods. Hldgs., LLC*, 67 A.3d 400, 409, 422 (Del. 2013) (finding a breach of the implied covenant of good faith and fair dealing where a party relies on an insufficient fairness opinion), *overruled on other grounds by Winshall v. Viacom Int'l Inc.*, 76 A.3d 808, 816 n.13 (Del. 2013).

[257] App. to DOB at A1313–14 (LLC Agreement §§ 5.1, 5.2(c)(ii)). The number of directors is also subject to the discretion of Holdings. As Sole Member, Holdings can change the number of directors through a resolution. *Id.* at A1313 (LLC Agreement § 5.1).

protections untethered to the language of the LLC Agreement.[258] It also conflicts with the overall scheme of Boardwalk's sponsor-friendly MLP framework, which allowed a streamlined privatization process in the event of changes to FERC policies adversely affecting Boardwalk.[259] Further, as the Boardwalk entities point out, acceptance and exercise are separate steps – "[o]ne creates an option; the other addresses whether to exercise it."[260] Even after the General Partner deemed the opinion acceptable, commercial circumstances could intervene that might cause the General Partner not to exercise the call right. Boardwalk's public disclosures explained that receipt of the opinion gives the General Partner "the right . . . but not the obligation" to exercise the call right.[261] As distinct steps, neither acceptance nor

---

[258] *See Dieckman,* 155 A.3d at 366; *see also Re DG BF, LLC v. Ray*, 2020 WL 3867123, at *4 (Del. Ch. July 9, 2020) ("When this Court has found the language of a contract clear and unambiguous, it has refused to expand the contract's scope to include rights not expressly granted. Indeed, where 'the relevant contracts expressly grant the [parties] certain rights ... the court cannot read the contracts as also including an implied covenant to grant [a party] additional unspecified rights . . . .'" (footnote omitted) (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004))).

[259] *Allen v. El Paso Pipeline GP Co., L.L.C.* is illustrative of the Court of Chancery's refusal to create minority protections when doing so would contradict the drafters' intentions. 113 A.3d 167, 192 (Del. Ch. 2014) ("The drafters of the LP Agreement chose a framework that maximized the General Partner's freedom and minimized the opportunities for litigation and judicial oversight. . . . [T]he parties would not have agreed to . . . a requirement that the Conflicts Committee obtain a fairness opinion that would be subject to judicial review for the sufficiency of its contents and analytical rigor."). It is unlikely that the drafters intended an independent check on the call right, a critical issue for Loews, when there was no need to have such a check.

[260] DRB at 38–39.

[261] App. to DOB at A1452 (Draft Prospectus); *id.* at A1813 (Amend. No. 4 to Draft Prospectus); *id.* at A2361 (Amend. No. 5 to Draft Prospectus); *id.* at A2719 (Final Prospectus).

exercise would be "mere surplusage" under a single decisionmaker.[262]  Surplusage

means a provision has no meaning.[263]  If there is a reasonable construction, it is not

for courts to assign a meaning beyond what was written.

Finally, the Court of Chancery discussed internal law firm emails where

attorneys went back and forth about what advice should be offered about the proper

decisionmaker to accept the Opinion of Counsel.  That attorneys considered

ambiguity arguments does not make the acceptability determination ambiguous.[264]

It is what attorneys do – explore arguments as part of their professional advice.  Here,

we have found that the Partnership Agreement and the LLC Agreement, when read

together, were unambiguous.  Thus, we do not consider what attorneys might have

discussed as part of their internal deliberations before rendering their opinion.

The Court of Chancery erred when it decided that the GPGP Board had to

make the acceptability determination.  The Sole Member Board, and not the GPGP

---

[262] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 397 (Del. 2010)); *see also Fillip v. Centerstone Linen Servs., LLC*, 2014 WL 793123, at *4 (Del. Ch. Feb. 27, 2014) (holding that "all language in a contract is to be given meaning so far as possible" before finding surplusage); *Sunline*, 206 A.3d at 846.

[263] *See Osborn*, 991 A.2d at 1159; *see also Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 900 (Del. 1994) (words are not surplusage if there is a reasonable construction which will give them meaning).

[264] *See AT & T Corp. v. Faraday Cap. Ltd.*, 918 A.2d 1104, 1108 (Del. 2007) ("The fact that the parties disagree on the meaning of a term does not render that term ambiguous."); *Manti Hldgs., LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) ("The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous." (quoting *Osborn*, 991 A.2d at *1160)).

Board, exercised ultimate authority to cause the exercise of the call right. Thus, the General Partner did not breach the Acceptability Condition.

C.

The Court of Chancery also found that the General Partner breached Section 15.1(b) because Baker Botts gave a contrived opinion at the behest of individuals associated with the Boardwalk entities. Our colleagues in concurrence raise important concerns about the Court of Chancery's analysis of the Baker Botts Opinion. But we choose a different path to decide this appeal.

Under Section 7.8(a), the plaintiffs cannot recover damages from the General Partner unless it acted in bad faith or engaged in fraud or willful misconduct.[265] Under Section 7.10(b), the General Partner is "conclusively presumed" to have acted in good faith when it relies on advice of counsel "as to matters that the General Partner reasonably believes to be within [counsel's] professional or expert confidence."[266]

The General Partner, through the Sole Member, obtained advice from Skadden that the Baker Botts Opinion was reasonable and that it would be reasonable to accept the Opinion and cause the General Partner to exercise the call right. Skadden staffed the engagement with a team of FERC policy experts and

---

[265] App. to DOB at A3090 (Partnership Agreement § 7.8(a)).
[266] *Id.* at A3092 (Partnership Agreement § 7.10(b)).

Delaware law experts and delivered a comprehensive written presentation to the Sole Member Board. [267] It included a thorough analysis of Boardwalk's governing documents and a complete review of the Baker Botts Opinion.[268] Three other law firms, Davis Polk, Richards Layton & Finger, and Vinson & Elkins, provided advice regarding the Acceptability Condition, bolstering the credibility of Skadden's opinion.[269] In our view, the General Partner's decisionmaker for the call right exercise – the Sole Member – reasonably relied on the Skadden Opinion to cause the call right exercise. Thus, the General Partner is presumed to have acted in good faith and is immune from damages. For the reasons explained below, we find unpersuasive the Court of Chancery's reasons for disregarding the Skadden Opinion and the Sole Member Board's reliance on the Opinion.

1.

As an initial matter, we disagree with the Court of Chancery's conclusion that agency law should take precedence over the MLP's contractual scheme. The Court of Chancery lumped together a number of individuals and found that their *scienter* as management-level officers and agents of Loews, the Sole Member, the GPGP, the

---

[267] *See id.* at A5103 (Skadden Opinion).
[268] *See id.* at A5081–93 (Sole Member Board Meeting Minutes); *id.* at A5100–22 (Skadden Opinion).
[269] *See id.* at A660 (Alpert Tr.) ("Ramey Layne weighed in at Vinson & Elkins, as well as Davis Polk"); *id.* at A4593–94 (Boardwalk Board Meeting Minutes); *id.* at A766 (Raju Tr.) ("Baker Botts, Skadden, Davis Polk, and Vinson & Elkins agreed with [Richards Layton & Finger's] analysis."); App. to PAB at B1333–37 (Richards Layton & Finger Analysis).

General Partner, and Boardwalk could be imputed to the General Partner.[270] To support its agency theory, it relied in part on the Court of Chancery's decision in *Dieckman v. Regency GP LP*, where the court found that "[a]n entity … can only make decisions or take actions through the individuals who govern or manage it."[271] Relying again on *Dieckman*, the court found that the General Partner could be charged with the wrongdoing of its agents and others when they "engaged in 'intentional wrongdoing … designed to … seek an unconscionable advantage.'"[272] The *Dieckman* decision, however, requires the court to focus on the state of mind of the decisionmaker – here, the Sole Member – and not agents of the General Partner.[273]

The Court of Chancery in *Dieckman* did not sanction an agency theory to extend the exculpation inquiry beyond those who govern a partnership or limited liability company. The "govern and manage it" quote relied on by the court comes from *Gerber v. EPE Holdings, LLC*, where the Court of Chancery made clear that those who govern and those who manage means board-level actors.[274] Quoting from *Gerber*: "[a]n entity, such as Enterprise Products GP, can only make decisions or take actions through the individuals who govern or manage it. In this case,

---

[270] *Bandera*, 2021 WL 5267734, at *80.
[271] *Id.* (quoting *Dieckman v. Regency GP LP*, 2021 WL 537325, at *36 (Del. Ch. Feb. 15, 2021), *aff'd*, 264 A.3d 641 (Del. 2021)).
[272] *Id.* (omissions in original) (quoting *Dieckman*, 2021 WL 537325, at *36).
[273] *See Dieckman*, 2021 WL 537325, at *36.
[274] 2013 WL 209658, at *13 (Del. Ch. Jan. 18, 2013).

Enterprise Products GP is managed by its board of directors."[275] The same holds

true in *Dieckman*, where the Court of Chancery made clear that "it is the Board that

governs and manages the General Partner and in turn, Regency."[276]

Regency, the MLP in *Dieckman*, had a structure similar to Boardwalk's – a

general partner, Regency GP LP; and a general partner LLC of the general partner,

Regency GP LLC.[277] Regency had "governance documents vest[ing] the board of

directors of Regency GP LLC . . . with the authority to govern and manage

Regency."[278] Authority flowed to Regency GP LLC through the Regency LP

partnership agreement, but at the LLC level, the sole member delegated its authority

to the LLC board.[279] The partnership agreement also contained an exculpation

provision nearly identical to the one here.[280] The Court of Chancery found after trial

that the General Partner breached the implied covenant of good faith and fair dealing

by manipulating the special approval and safer harbor MLP provisions. When

reviewing whether the General Partner engaged in fraud or willful misconduct for

---

[275] *Id.*

[276] *Dieckman*, 2021 WL 537325, at *36.

[277] *Id.* at *2.

[278] *Id.*

[279] *See id.* at *2 n.8 ("Article VI of the Amended and Restated Agreement of Limited Partnership of Regency GP LP provides, subject to certain exceptions not relevant here, that 'all powers to control and manage the business and affairs of [Regency GP LP] shall be vested exclusively in [Regency GP LLC].' Under Section 7.1(c) of the Amended and Restated Limited Liability Agreement of Regency GP LLC, the sole member of Regency GP LLC, subject to certain limitations not relevant here, 'delegated ... to the Board of Directors of [Regency GP LLC] (the "Board") ... all of [Regency GP LLC's] power and authority to manage and control the business and affairs of [Regency].'" (omissions in original)).

[280] *Id.* at *36.

exculpation purposes, the Court of Chancery looked to the Board that approved the

transaction and not to the conduct of the agents of the general partner:

> Here, it is the [LLC] Board that governs and manages the General Partner and, in turn, Regency.  Thus, determining whether the General Partner acted in bad faith or engaged in fraud or willful misconduct turns on the state of mind of the directors on the [LLC] Board who voted to approve or otherwise authorized a challenged action. Consistent with the default rules governing the [LLC] Board, to the extent the directors who voted to approve an action had different states of mind with respect to a particular matter, the determination of whether the General Partner acted with *scienter* inimical to the Partnership's interests would turn on the state of mind of a majority of directors who voted to approve the challenged action.[281]

In this appeal, we have decided that the Sole Member, acting for the General

Partner, caused the General Partner to exercise the call right and therefore "voted to

approve or otherwise authorized a challenged action."  Allowing agency law to

displace the Sole Member Board and the MLP's contractual terms undermines the

approval structure in the Partnership Agreement and the LLC Agreement.  The

proper review centers on the Sole Member Board – the entity responsible for the call

right exercise – and not non-decisionmaker agents of the General Partner.[282]

---

[281] *Id.* at *36.

[282] The Court of Chancery also imputed Baker Botts' *scienter* to the General Partner.  For the same reasons explained above, any wrongful conduct cannot be imputed to the General Partner because the law firm did not "vote[] to approve or otherwise authorize[] a challenged action."  *Id.*  The Partnership Agreement also immunizes the General Partner from "any misconduct or negligence on the part of any . . . agent appointed by the General Partner in good faith."  App. to DOB at A3090 (Partnership Agreement § 7.8(b)).  Finally, we note that the case relied on by the Court of Chancery to impute counsels' misconduct to the General Partner only addressed whether "notice given to a retained lawyer-agent may be viewed as notice to the client-principal."  *Vance v. Irwin*, 619 A.2d 1163, 1165 (Del. 1993).  It does not support imputing *scienter* from a lawyer to a client.

2.

The Court of Chancery also held that the General Partner could not rely on the Skadden Opinion for purposes of Section 7.10(b) because the Sole Member Board received the Opinion and not the General Partner. But the Skadden Opinion still redounds to the benefit of the General Partner because the Sole Member Board was acting for the General Partner when it caused the call right exercise.

We addressed a similar situation in *Norton*.[283] There, the plaintiffs challenged a merger between K–Sea Transportation Partners L.P. ("K–Sea") and Kirby Corporation. K–Sea's general partner was K–Sea General Partner L.P. ("K–Sea GP"). K–Sea GP's general partner was K–Sea General Partner GP LLC ("KSGP"). KSGP ultimately controlled K–Sea. KSGP's conflicts committee secured a fairness opinion addressing the adequacy of the merger consideration.[284] Like here, a conclusive presumption of good faith applied to the general partner when relying on professional advice.[285] The Court reasoned that even though a conflicts committee of the KSGP board obtained the fairness opinion, the presumption nonetheless applied to K–Sea's general partner:

> Although the Conflicts Committee of the K–Sea Board actually obtained the fairness opinion, it is unreasonable to infer that the entire K–Sea Board did not rely on the opinion that a K–Sea Board subcommittee obtained. Similarly, because K–Sea GP is a "pass-

---

[283] *Norton*, 67 A.3d at 367.
[284] *Id.* at 366–67.
[285] *Id.*

65

through" entity controlled by KSGP, the only reasonable inference is that K–Sea GP relied on the fairness opinion. K–Sea GP is therefore conclusively presumed to have acted in good faith when it approved the Merger and submitted it to the unitholders for a vote.[286]

The same reasoning applies here with equal force. The General Partner is a "pass-through entity" controlled by the GPGP. For purposes of the call right, the Sole Member, rather than the GPGP Board, controlled the GPGP and accepted Skadden's opinion for the General Partner. Thus, "the only reasonable inference" is that if the Sole Member relied on Skadden's opinion, then so did the General Partner.

3.

The Court of Chancery described the Skadden Opinion as a "whitewash" of the Baker Botts Opinion. But other than using a colorful word and speculating that Skadden was brought in to lend credibility to the Baker Botts Opinion, the Court of Chancery did not find that Skadden acted in bad faith, and Bandera does not argue that Skadden acted in bad faith.[287]

The court also described the Skadden Opinion as an "opinion about an opinion," and cast doubt on whether multiple opinions were contemplated by Section 7.10(b).[288] We find nothing disqualifying about Skadden giving "an opinion about

---

[286] *Id.* at 367.

[287] Oral Argument at 51:38, *Boardwalk Pipeline P'rs, L.P., v. Bandera Master Fund LP*, No. 1, 2022 (Del. argued Sep. 14, 2022), https://livestream.com/delawaresupremecourt/events /10612698/videos/232917888 ("The [Court of Chancery] doesn't find that Skadden acted in bad faith, and we wouldn't argue that they did.").

[288] *Bandera*, 2021 WL 5267734, at *81.

an opinion." Ultimately, under the Partnership Agreement and the LLC Agreement, the Sole Member Board had to determine whether the Baker Botts Opinion was acceptable before it caused the General Partner to exercise the call right. Skadden provided an opinion of counsel on both the reasonableness of the Baker Botts Opinion and the reasonableness of accepting the Opinion.[289]

Skadden concluded that it would be reasonable for the Sole Member Board to accept the Baker Botts Opinion. It did so having full knowledge of Baker Botts' analytical framework, including its assumptions, models, and its interactions with Boardwalk's officers. Implicit in this acceptability opinion is Skadden's conclusion that the Baker Botts Opinion was not contrived and that it was rendered in good faith. That the Court of Chancery found otherwise after intensive litigation, which included the testimony of fourteen witnesses (including six experts) and a four-day trial, does not retroactively negate the Sole Member Board's reasonableness in relying on the Skadden Opinion – an opinion not independently challenged by Bandera.

---

[289] The court also faulted Skadden for not "opin[ing] on the core issue" whether there was a material adverse effect on Boardwalk from the change in FERC Policy. *Bandera*, 2021 WL 5267734, at *81. But Skadden was not offering a duplicate opinion on the substance of each of the matters considered by Baker Botts. Instead, Skadden's Opinion addressed the ultimate question required by the governing agreements and considered by the Sole Member Board before it could cause the call right exercise – whether the Baker Botts Opinion should be considered reasonable and acceptable to that Board. *See* App. to DOB at A5121 (Skadden Opinion).

4.

The Court of Chancery also found that "the General Partner cannot invoke the Reliance Provision for purposes of the Acceptability Condition because the wrong decisionmaker considered the issue" and "with the wrong decisionmaker having acted, the General Partner cannot claim to have relied validly on Skadden's advice."[290]   Our earlier finding that the Sole Member Board was the proper decisionmaker negates this basis for disregarding the Sole Member Board's reliance on the Skadden Opinion.

5.

Unlike a rebuttable presumption, Section 7.10(b)'s conclusive good faith presumption is, as its name denotes, conclusive.[291]  Interpreting a nearly identical provision in *Gerber*, this Court explained that "Section 7.10(b) is a contractual provision that establishes a procedure the general partner may use to conclusively establish that it met its contractual fiduciary duty."[292]  In other words, once Section 7.10(b) is validly triggered through reliance on expert advice, good faith is

---

[290] *Bandera*, 2021 WL 5267734, at *81.
[291] *See Morris v. Spectra Energy P'rs (De) GP, LP*, 2017 WL 2774559, at *10 (Del. Ch. June 27, 2017) (distinguishing conclusive presumptions from rebuttable presumptions); *see also Sun Equities Corp. v. Computer Memories Inc.*, 1988 WL 13565, at *1–2 (Del. Ch. Feb. 16, 1988) (equating an irrebuttable presumption with a conclusive presumption).
[292] *Gerber*, 67 A.3d at 420.

"conclusively establish[ed]" and no longer subject to challenge.[293]  Here, the Sole

Member Board received the Skadden Opinion, followed its advice that it would be

reasonable to accept the Baker Botts Opinion, and caused the call right exercise.  The

conclusive presumption was triggered and therefore required a finding of good faith

by the Sole Member Board.  In turn, the Sole Member Board's good faith actions on

behalf of the General Partner exculpate the General Partner from damages.

6.

Finally, leaving aside the conclusive presumption, the Court of Chancery did

not find that a majority of the Sole Member Board engaged in fraud, bad faith, or

willful misconduct.  Kenneth Siegel, Jane Wang, and Peter Keegan made up the Sole

Member Board.  The Court of Chancery addressed the alleged misconduct of one

board member, Kenneth Siegel.[294]  But there were no findings about the other two

directors.  The Court of Chancery did not review the conduct of Jane Wang and Peter

Keegan, finding their states of mind irrelevant to whether the limited partners could

---

[293] *See Sun Equities*, 1988 WL 13565, at *1–2 (explaining that a "[party] may attempt to come forward and meet the burden [of] negat[ing] a presumption" if "it is not a conclusive presumption"); *see also Emps. Ret. Sys. of City of St. Louis v. TC Pipelines GP, Inc.*, 2016 WL 2859790, at *5 (Del. Ch. May 11, 2016) (explaining that satisfying a contractual mechanism for establishing a transaction's fairness is "*conclusive* evidence that such transaction is fair and reasonable, and . . . therefore, *preclusive* of further judicial review"), *aff'd sub nom. Emps. Ret. Sys. of the City of St. Louis v. TC Pipelines GP, Inc.*, 152 A.3d 1248 (Del. 2016).
[294] *Bandera*, 2021 WL 5267734, at *80.

69

recover from the General Partner.[295] The court only referred to them in passing, noting their positions on the Sole Member Board and in relation to the Loews and the Boardwalk entities.[296] A further reference to Jane Wang was in a footnote with excerpts from Kenneth Siegel's trial testimony that included a question where Siegel was asked if "Barclays gave input to Ms. Wang about the model" and to which he responded "I don't know."[297]

For the first time on appeal, Bandera asserts that Jane Wang "also knew the score."[298] It claims there is "ample evidence" in the record demonstrating her willful misconduct.[299] But the record Bandera points us to shows only that Wang was involved in the diligence process for the call right, as her duties as a Loews SVP and Sole Member director would require.[300] It does not show that she manipulated the process or forced desired outcomes as the court found for Alpert, Siegel, McMahon, and Johnson.[301] Her involvement in drafting the press release is also tenuous – no

---

[295] *Id.* ("If the court were deciding whether to hold Siegel, Keegan, or Wang personally liable for their decision to exercise the Call Right, such as under a tortious interference theory, then that mode of analysis might be warranted. But the plaintiffs are seeking to recover damages from the General Partner, not those three individuals.").

[296] *Id.* at *9–10.

[297] *Id.* at *86 n.37.

[298] PAB at 77–78.

[299] *Id.* at 77.

[300] *See, e.g.*, App. to PAB at B2410, B2418 (Alpert Dep.); *id.* at B303.

[301] *See Bandera*, 2021 WL 5267734, at *80.

direct action is attributable to her except for passing on Loews' collective comments to Boardwalk.[302]

The ADIT and rate case risk evidence Bandera relies on shows at most that Wang was aware of a degree of uncertainty regarding the impact of the FERC policies.[303] A degree of uncertainty is not enough to show that Wang engaged in willful misconduct.[304] Thus, even if we consider arguments raised for the first time on appeal and put aside the fact that the Sole Member Board, and therefore the General Partner, could have reasonably relied on Skadden's opinion, the record does not support a bad faith or willful misconduct finding for two out of the three members of the Sole Member Board.

IV.

Under the Partnership Agreement and the LLC Agreement, the General Partner could exercise the call right to repurchase the public units if it received an Opinion of Counsel that was acceptable to the Sole Member. When exercising the call right, the Sole Member acted in its individual capacity, meaning it was free from fiduciary duties. If it complied with the Partnership Agreement and the LLC

---

[302] App. to PAB at B375.
[303] *Id.* at B373; *id.* at B507.
[304] *See Bandera*, 2021 WL 5267734, at *80 ("[Willful misconduct] requires a showing of 'intentional wrongdoing, not mere negligence, gross negligence or recklessness.'" (quoting *Dieckman*, 2021 WL 537325, at *31)).

71

Agreement, it was free to exercise the call right, even if the timing of the exercise was disadvantageous to the public unitholders.

Even though the Court of Chancery found after trial that Baker Botts provided a compromised opinion, under the Partnership Agreement and LLC Agreement, the proper focus was on the Sole Member and the opinion it received from Skadden. Skadden found the Baker Botts Opinion reasonable and advised that the Sole Member Board would be acting reasonably if it accepted the Baker Botts Opinion. The Sole Member Board followed Skadden's advice and caused the call right exercise. Having reasonably relied on Skadden's advice, the General Partner, through the Sole Member, is conclusively presumed to have acted in good faith and is exculpated from damages.

The Court of Chancery severed and stayed Counts II, III, IV, and V of Bandera's complaint pending appeal. Thus, we reverse the Court of Chancery's partial final judgment and remand for further proceedings consistent with this opinion.

**VALIHURA**, Justice, concurring, with **LEGROW**, Judge, joining:

I agree with the Majority that the trial court erred in holding that Boardwalk GP, LLC's Board was the correct decision-maker as to the Acceptability determination. As the Majority concludes, the General Partner, acting through the Sole Member, was the correct decision-maker.

Although I concur in the decision to reverse, and, thus, in the judgment, I write separately because I would reverse the trial court's decision that the opinion of counsel (the "Opinion") of Baker Botts LLP ("Baker") was not rendered in good faith (the "Breach Holding"). I do not address the exculpation issues and express no view as to the correctness of the Majority's analysis, particularly as to the various findings of bad faith which the Majority allows to remain standing.[1] The issues presented regarding the Breach Holding were the focal point of the case and are important to both practitioners and their corporate clients. The Breach Holding has the potential to fundamentally alter the legal environment in which opinions of counsel are prepared.

---

[1] In addition, it is unclear to me, under the Majority's view, how the Call Right in Section 15.1 of the Partnership Agreement can even be deemed to have been triggered. As Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") observed in its opinion, "[a]s a pre-condition to exercising the Call Right, Section 15.1(b)(ii) requires that the General Partner receive an 'Opinion of Counsel,' to the effect that the Partnership's status as a pass-through entity for tax purposes has or will reasonably likely in the future have a material adverse effect on the maximum applicable rate that can be charged to customers by the Partnership's subsidiaries[.]" A5102. Skadden opined that Baker's Opinion conforms to the requisite language in Section 15.1(b). *See* A5110. However, Skadden did not opine on whether there was an MAE. In fact, Skadden stated expressly that "we have not been asked to undertake, and have not undertaken, any analyses for purposes of rendering the Opinion of Counsel contemplated in Section 15.1(b)(ii) of the LPA (*and are not rendering such an opinion*)[.]" A5121 (emphasis added). And because the Majority leaves the findings regarding Baker's Opinion in place, according to my reading of the Majority's opinion, Baker's Opinion did not satisfy Section 15.1(b)(ii), and, thus, a necessary precondition to the exercise of the Call Right was not satisfied.

I believe the trial court misapplied our existing law in analyzing Baker's Opinion. It viewed the Opinion through a *de novo* lens, instead of the more deferential standard set forth in *Williams*.[2] The trial court rejected Baker's view of what Section 15.1(b) required. Instead, it substituted its own legal analysis of Section 15.1(b)'s analytical framework and then measured Baker's work product against that standard. Baker's legal analysis — whether it was substantively correct or not — was entitled to deference unless it was so far off the mark substantively as to warrant rejection, or unless it was the product of bad faith.

The trial court undertook extensive fact-finding after reviewing a vast trial record. Notwithstanding its impressive effort, I do not believe that its findings of bad faith on Baker's part are entitled to our usual deference for several reasons.[3]

*First*, many of the key findings are a function of the court's misapplication of *Williams* and its rejection of Baker's model. In particular, many of the court's findings of bad faith depend upon its critique of Baker's interpretation of the Call Right and Baker's assumptions in its model. However, Delaware case law regarding opinions of counsel does not permit a trial court to substitute its legal interpretation for one reached by counsel in good faith. The trial court then applied its interpretation of the Call Right to Baker's assumptions and concluded that they were unreasonable. But several key facts suggest that Baker's assumptions and its interpretation of Section 15.1(b) were not the product of bad

---

[2] *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682 (Del. Ch. June 24, 2016), *aff'd*, 159 A.3d 264 (Del. 2017) [hereinafter *Williams*, 2016 WL 3576682, at _].

[3] Notwithstanding the Majority's silence on the Breach Holding and the proper standard of review, I would urge that *Williams* is, and remains, the proper standard.

faith.  For one, Plaintiffs' Federal Energy Regulatory Commission ("FERC") expert testified at trial that the assumptions employed by Baker in its analysis were reasonable. In addition to Plaintiffs' FERC expert, two law firms previously engaged by Plaintiffs agreed that the Call Right had been triggered.  Further, the Plaintiffs' representative even agreed that Baker's reading of the contractual language was the correct reading.

*Second*, Baker's analysis was confirmed by its Delaware counsel.  Richards, Layton & Finger, P.A. ("Richards Layton") agreed with Baker that recourse rates meant "maximum applicable rates."[4]

*Third*, Skadden opined that Baker's Opinion was acceptable and that Baker's assumptions were reasonable.  Not a single finding of bad faith was made against Skadden. Although the evidence suggests that Loews' Alpert "threatened to fire Skadden," beat them up until they fell in line, and sidelined them by terminating their representation of GPGP, Skadden's lead corporate partner testified that the firm did not experience pressure or "bullying" from its client.  And though the record amply supports the conclusion that Loews was an aggressive client, the record also contains clear testimony from the lead corporate partner that the firm's advice and independence were not affected by any such behavior.

Notwithstanding what I perceive to be a legal error that permeates the court's factual analysis, the record is far from perfect for Appellants.  Here, the unveiling of the legal privileges and attorney work product communications revealed to all the sausage-making

---

[4] Richards Layton advised that the "[b]etter [r]eading" of the Call Right was to "look [at] rates more, not effects[.]"  B1126.

process. But one should recognize that what emerges as the end product may differ significantly from earlier drafts, and that earlier drafts may reflect differences of views among the working group members, and theories and views may change over time.[5] The drafting of a legal opinion may involve numerous lawyers and client representatives across multiple disciplines and areas of the business. The process may demand an exploration of issues, exchanges of ideas, discussions, and numerous drafts — including research and drafts by team members less senior and those not responsible for the ultimate decision-making. Basing findings of bad faith on preliminary drafts and internal discussions when views may develop differently and change as a result of the give-and-take during the process could potentially chill the free exchange of ideas, analysis, and discussion needed to undertake such complicated tasks.[6]

My reasoning on these points is set forth more fully below.

---

[5] For example, the trial court, citing JX 800 at 2, which is an April 10, 2018 email from C. Naeve to F. Bayouth (both of whom are Skadden lawyers), stated that Naeve believed that "maximum applicable rate" could mean either "the maximum rate applicable to customers taking into consideration discounted contracts that have been filed at FERC" or "the maximum rate contained in the tariff which the pipeline could have charged and is free to charge other customers[.]" *Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2021 WL 5267734, at *60 (Del. Ch. Nov. 12, 2021) [hereinafter *Trial Opinion*, 2021 WL 5267734, at _]. But the record shows that this internal email between and among Skadden lawyers was sent before Naeve had reviewed the relevant documents. A4250. After reviewing the documents, Naeve agreed that "recourse rate" was the more reasonable reading. *Id*. Skadden's ultimate opinion given to its client stated that, "[w]e believe that it is reasonable for Baker Botts to conclude that the 'maximum applicable rate that can be charged to customers by subsidiaries that are regulated interstate natural gas pipelines of the Partnership' means 'recourse rates of the Subsidiaries now and in the future as that term is used by the FERC in its regulations, rulings and decisions.'" A4751.

[6] A *de novo* review of an opinion of counsel — rather than the deferential review currently required under Delaware law — also has the potential to discourage clients from seeking out and relying upon opinions of counsel to inform their business decisions.

4

## A. The Trial Court Applied the Wrong Standard of Review

In *Williams Cos. Inc. v. Energy Transfer Equity, L.P.*,[7] the Court of Chancery correctly articulated the standard of review for a trial court's review of an opinion of counsel. There, the Court of Chancery observed:

> "Therefore, it is Latham's subjective good-faith determination that is the condition precedent. As a result, it is not appropriate for me to substitute my judgment on the Section 721(a) issue for that of Latham; my role is to determine whether Latham's refusal, thus far, to issue a 'should' opinion is in good faith, that is, based on Latham's independent expertise as applied to the facts of the transaction."[8]

Similarly, in *NHB Advisors, Inc. v. Monroe Capital LLC*,[9] the Court of Chancery applied the same deferential standard focused on the good faith of counsel as opposed to the legal correctness of the opinion itself.[10] There, "[u]nder [a] Trust Agreement, the Trustee was authorized to take 'any action that, based upon the advice of counsel, it determine[d] it is obligated to take (or fail to take) in the performance of any fiduciary or

---

[7] 2016 WL 3576682 (Del. Ch. June 24, 2016), *aff'd*, 159 A.3d 264 (Del. 2017).

[8] *Id*. at *11.

[9] 2013 WL 3790745 (Del. Ch. July 19, 2013).

[10] *See also Site 35 Redev. Assocs. No. 1 by Marcus v. Kretchmer*, 559 N.Y.S.2d 911, 914 (N.Y. Sup. Ct. 1989) (determining that if there is no demonstrated lack of independence, and the opinions of counsel are reasonable in light of the law and the facts, then they should be respected by the court).

"An opinion [of counsel] is an expression of professional judgment, *not a guarantee that a court will reach the same conclusion as opining counsel*. The recipient of a legal opinion, unlike the holder of an insurance policy, has no claim simply because the opinion proves to be incorrect. Lawyers may be liable for negligence, but they are not liable merely for being wrong." Scott Fitzgibbon & Donald W. Glazer, *Opinions of Counsel: What They Are and Why American Companies Ask for Them*, 1991 Int'l Bus. L.J. 873, 877 (emphasis added).

similar duty which the [Trustee] owes to the Beneficiaries or any other person or entity.'"[11]

"The Trustee sought the advice of independent counsel, Grover C. Brown, Esquire, who opined that 'the Trustee can be said to have a 'fiduciary duty or similar duty' to accept the settlement proposal.'"[12]

In *NHB Advisors*, the "Defendants argue[d] that [the Court of Chancery] should review the substance of Mr. Brown's decision to determine whether Mr. Brown *was correct* in opining that the Trustee has a duty to accept the settlement."[13]  In refusing to do so, the Court of Chancery stated:

> "Defendants argue that Mr. Brown's determination as to the Trustee's duty is incorrect.  I need not review the substance of Mr. Brown's decision for its correctness under Delaware law, however.  In this matter, the Plaintiff seeks a declaratory judgment as to whether it is empowered to accept the settlement offer."[14]
>
> "The relevant language of the Trust Agreement provides that the Trustee may so act if counsel advises that the Trustee has a fiduciary duty to so act; the contract *does not require the Trustee to seek court approval or to ensure that the advice it received from counsel was legally correct*."[15]
>
> The trial court's "review of the substance of Mr. Brown's opinion would render the advice-of-counsel provision of the agreement superfluous.  The Trustee has sought, and received, advice of counsel under the Trust Agreement."[16]

---

[11] *NHB Advisors*, 2013 WL 3790745, at *1.

[12] *Id.*

[13] *Id.* at *2 (emphasis added).

[14] *Id.* at *3.

[15] *Id.* (emphasis added).

[16] *Id.*

"A good-faith determination by the Trustee that it has a fiduciary duty to accept the settlement, based on advice of counsel, triggers the Trustee's authority. The Plaintiff need not demonstrate that [counsel's] advice is correct in order to demonstrate its authority under the Trust Agreement."[17]

The trial court below erred when it departed from *Williams* and *NHB Advisors* in deciding the Breach Holding. Rather than deferring to counsel's view as to what kind of opinion Section 15.1(b) requires, the trial court engaged in its own substantive, *de novo* legal analysis.[18] Our law does not require that Baker's advice be *legally correct*, although that is certainly desirable. What it requires is a good faith effort to render an opinion of counsel on the potential exercise of the Call Right.

*B. The Court Substituted Its Own View of Section 15.1(b) for that of Counsel*

The opinion below reveals that the trial court had a different view of what the Opinion should consider. For convenience, I repeat the text of Section 15.1(b), as it drives the legal analysis:

"Section 15.1 *Right to Acquire Limited Partner Interests.*

(b) Notwithstanding any other provision of this Agreement, if at any time: (i) the General Partner and its Affiliates hold more than 50% of the total Limited Partner Interests of all classes then Outstanding and (ii) *the General Partner receives an Opinion of Counsel that the Partnership's status as an association not taxable as a corporation and not otherwise subject to an entity-level tax for federal, state or local income tax purposes has or will reasonably likely in the future have a material adverse effect on the maximum applicable rate that can be charged to customers by subsidiaries of the*

---

[17] *Id*.; *see also Cruden v. Bank of N.Y.*, 957 F.2d 961, 972 (2d Cir. 1992) (pursuant to certain trust indentures, which required indenture trustees to obtain opinions of counsel, the Second Circuit stated that "[n]or is the Trustees' good faith put in question merely by virtue of the fact that the opinion relied upon may have been wrong; to so hold would eviscerate the opinion of counsel defense.").

[18] To be fair to the trial court, this was a case of first impression where counsel conceded that there was no precedent involving language similar to Section 15.1(b).

*Partnership that are regulated interstate natural gas pipelines*, then the General Partner shall then have the right, which right it may assign and transfer in whole or in part to the Partnership or any Affiliate of the General Partner, exercisable at its option within 90 days of receipt of such opinion, to purchase all, but not less than all, of all Limited Partner Interests then Outstanding held by Persons other than the General Partner and its Affiliates, at a purchase price for each class of Limited Partner Interests equal to the average of the daily Closing Prices per Limited Partner Interest of such class for the 180 consecutive Trading Days immediately prior to the date three days prior to the date that the notice described in Section 15.1(c) is mailed."[19]

The trial court construed Section 15.1(b) as calling for an analysis of whether there was a material adverse effect on the *business*. A few of the court's findings on this point suggest that this is the case:

"The Opinion Condition required counsel to address a mixed question of fact and law: whether an event had or was reasonably likely in the future to have a material adverse effect on the maximum applicable rate that Boardwalk could charge its customers. By focusing on a rate that could be charged to customers, the Opinion Condition meshed imperfectly with Loews' business goal of protecting against future regulatory action that would have *a material adverse effect on Boardwalk*."[20]

"The Call Right sought to protect Loews against a regulatory change that would have *a materially adverse effect on Boardwalk*."[21]

"As described in the Factual Background, Rosenwasser developed his syllogism so that Baker Botts could render the Opinion. Rosenwasser knew that the *Call Right was intended to address a business issue by protecting Loews against a regulatory change that would have a materially adverse effect on Boardwalk*. Rates were relevant because they led to revenue. The Call Right was not intended to create a regulatory trapdoor that could be triggered by a change that 'wasn't substantive, wasn't meaningful.' In fact, Rosenwasser did not believe that 'rates' were what the Call Right was designed to protect. *The Call Right was intended to provide Loews with an*

---

[19] A3117 (LPA § 15.1(b)) (emphasis added).

[20] *Trial Opinion*, 2021 WL 5267734, at *1 (emphasis added).

[21] *Id.* at *21 (emphasis added).

8

*'off-ramp' if FERC changed its policy in a way that materially threatened Boardwalk as an entity.*"[22]

"Rosenwasser's syllogism ignored that the Call Right was drafted to address a business issue, not an abstract legal question. The syllogism ignored the absence of any real-world effect on revenue in favor of focusing on recourse rates. It ignored the question of rate case risk and the real-world events that would have to take place before there was any effect on recourse rates. The syllogism was a contrived exercise designed to achieve a particular result."[23]

The trial court's different view of the proper focus of Section 15.1(b) then formed the basis upon which the court evaluated Baker's conduct. In this regard, the court's approach to Section 15.1(b) surpassed its mandate under *Williams*. "[I]t is not appropriate for [the Court of Chancery] to substitute [its own] judgment" on the merits of an opinion of counsel.[24] The principle articulated in *Williams* makes practical sense. The parties to the LPA required an opinion of *counsel* in order to trigger the Call Right. They did not bargain for an opinion of a *court* to do so.[25]

Although there may be circumstances where a legal opinion is so deficient on its face that a court may properly determine that it is not sufficiently reliable, I do not think that this is such a case. My view is reinforced by the record below, where, as noted above,

---

[22] *Id.* at *63 (internal citations omitted) (emphases added).

[23] *Id.* at *65.

[24] *Williams*, 2016 WL 3576682, at *11.

[25] This principle of judges not substituting their own views and judgment for that of the lawyers in the trenches can be found in other areas of practice, including intellectual property litigation, for example. *See, e.g.*, *Graco, Inc. v. Binks Mfg. Co.*, 60 F.3d 785, 793 (Fed. Cir. 1995) ("Whether or not an opinion was legally correct is not the proper focus."); *Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 944 (Fed. Cir. 1992) ("While an opinion of counsel letter is an important factor in determining the willfulness of infringement, its importance does not depend upon its legal correctness.").

even Plaintiffs' counsel, expert, and representative all agreed with Baker's view that the Call Right was easily triggered, was likely triggered here, and that Baker's assumptions were reasonable or, at least, not *unreasonable*.

For example, Plaintiffs' representative agreed with Baker's reading of the contract:

"I think this is a winning argument in court and that Loews' attorneys will tell them so, which is why I think they will exercise the option now and I think we should be buying. The reason why I think it is a winning argument is twofold: *First, it is a reasonable reading of the contractual language, without importing any ideas about fairness to rewrite the text. Any other reading makes the 90-day requirement meaningless.* Second, despite the elimination of fiduciary duties in the MLP agreement, which Delaware courts will enforce, Loews is still subject to the duty of 'good faith and fair dealing.' Although Delaware courts haven't given this duty a very expansive reading, even they agree that this duty requires complying with 'implicit requirements naturally inferred from the express terms' of the MLP agreement. I think that reinforces the notion that Loews has an implied requirement to act promptly after the change of law that is naturally inferred from the express 90-day requirement."[26]

Plaintiffs' representative also stated that the Call Right could be triggered "even if [] the change in law won't affect rates until 1,000 years from now[.]"[27]

Further, Plaintiffs' prior counsel acknowledged that the Call Right was easy to trigger. At a settlement hearing early in this case, counsel stated that the Call Right is "a pretty easy option to trigger. I mean, on the face of it . . . the way this crazy option is worded is if FERC changes the maximum rate, the option is available, even if it doesn't have any impact on the business."[28]

---

[26] A4346 (emphasis added).

[27] *Id.*

[28] A158 (Settlement Hearing Trans. at 9:9–14).

10

Then at trial, Plaintiffs' FERC expert testified that the assumptions and inputs relied upon by Baker were reasonable, or, at least, not unreasonable. The following chart shows the lack of disagreement between Baker and Plaintiffs' FERC expert as to Baker's assumptions.[29]

| Baker's Assumptions | Plaintiffs' FERC Expert Testimony |
|---|---|
| "The Revised Policy [by FERC] was final."[30] | "Q. If we look at Slide 57, these unsound assumptions include that 'the Revised Policy will not be revised, reversed,' et cetera, et cetera. A. Right. Q. Ms. Court, since the revised policy statement and Opinion 511-C, no MLP has successfully argued to FERC that it should retain their income tax allowance; right? A. I don't know that for a fact. Q. But you aren't aware of any contrary examples; right? A. That's correct."[31] <br><br> "Q. And to this date, FERC has not reversed the revised policy statement; correct? A. That is correct."[32] |
| "Recourse rates are the same as hypothetical indicative rates."[33] | "Q. Ms. Court, you would agree that it was reasonable for Baker Botts and Skadden to equate the terms 'maximum applicable rate' – to equate the term 'maximum applicable rate' |

---

[29] Plaintiffs' FERC expert did not agree with Baker's second assumption, which was that "the rates that Boardwalk's subsidiaries could charge would change to the subsidiaries' detriment without a rate case." *Trial Opinion*, 2021 WL 5267734, at \*58. *See also* A778 (Susan Court Trial Test. at 864:13–865:10). But Baker's view of Section 15.1(b), which requires an analysis of events "in the future," encompassed a view that rate cases would take place in the future. *See* A584 (Michael Rosenwasser Trial Test. at 91:8–10) (noting that Baker looked at "if Boardwalk *decided to file a rate case in the future*, what would be their maximum applicable rates if they filed that rate case in the future[.]") (emphasis added).

[30] *Trial Opinion*, 2021 WL 5267734, at \*55.

[31] A787–88 (Susan Court Trial Test. at 901:18–902:5).

[32] A788 (Susan Court Trial Test. at 903:6–8).

[33] *Trial Opinion*, 2021 WL 5267734, at \*60.

11

| Baker's Assumptions | Plaintiffs' FERC Expert Testimony |
|---|---|
| | with recourse rate; right? A. Was it reasonable for them in the circumstances? Yes."[34] |
| "[H]ow FERC would treat ADIT was a known fact *and* that FERC would use the Reverse South Georgia Method."[35] | "Q. Would it have been unreasonable for Baker Botts to have assumed Reverse South Georgia Method prior to the July 18th rulings? A. Not unreasonable."[36] |

### C. Many of the Court's Key Findings of Bad Faith Derive From its Super-Imposition of its Model over Baker's Legal Analysis

Appellants contend that "[t]he trial court then convicted Baker of 'bad faith' for having answered the question 15.1(b) **does** ask—evaluating the 'reasonably likely' impact of tax status on recourse rates at any point 'in the future' based on neutral rate models."[37] To use an analogy raised at oral argument, the trial court used its own, different "Scantron" and graded Baker's conduct according to its interpretation of Section 15.1(b).[38] In other words, its factual findings are inextricably intertwined with its different, *de novo* interpretation of Section 15.1(b).

The trial court summarized its findings of bad faith as follows:

"Loews achieved this remarkable result because its in-house legal team and outside counsel worked hard to generate a contrived Opinion. The Opinion that outside counsel provided did not satisfy the Opinion Condition because outside counsel did not render it in good faith. Outside counsel knowingly made unrealistic and counterfactual assumptions, knowingly relied on an

---

[34] A787 (Susan Court Trial Test. at 901:2–7).

[35] *Trial Opinion*, 2021 WL 5267734, at *62 (emphasis in original).

[36] A786 (Susan Court Trial Test. at 894:2–5).

[37] Appellants Reply Br. at 10 (emphasis in original).

[38] *See* Oral Argument, at 9:00–11:30, https://livestream.com/delawaresupremecourt/events/10612698/videos/232917888.

12

artificial factual predicate, and consistently engaged in goal-directed reasoning to get to the result that Loews wanted. Among other noteworthy decisions detailed in this opinion, outside counsel determined that the regulatory proposals were sufficiently final to trigger the Call Right, even though everyone knew the proposals were not final. And outside counsel determined that the proposals were reasonably likely to have a material adverse effect on Boardwalk's rates, even as Boardwalk stated in its comments to FERC that it was impossible to determine the effect on Boardwalk's rates until FERC made a decision on the treatment of ADIT. To address the issue that management deemed impossible to assess, outside counsel examined hypothetical indicative rates, failed to incorporate the admittedly low chance that Boardwalk's rates actually would change, and derived the magnitude of the assumed change from a simple syllogism. Viewed as a whole, outside counsel's conduct went too far to constitute a good faith effort to render a legal opinion."[39]

The findings, for the most part, can be grouped into three categories: (i) model-based findings; (ii) public comment findings; and (iii) pressure/bullying findings. It may be that even when deferring to Baker's model and disregarding the court's different construct, the record does not necessarily justify giving Baker an "A." The Vice Chancellor's careful and detailed examination of the record reveals aggressive tactics by the client and other evidence that, if viewed in a short-term perspective, creates some dissonance with Baker's analyses. However, it is not necessary to say where on the grading scale Baker's effort falls because — when viewing the record as a whole — the conduct, in my view, does not equate to bad faith.

### 1. The Model-Based Findings

Courts should be especially cautious about wading into the thickets of a highly complex, regulatory arena, like the FERC arena. One of the prime examples of where the

---

[39] *Trial Opinion*, 2021 WL 5267734, at *2.

trial court did so was in its interpretation of "maximum applicable rates" for Baker's

interpretation. The trial court opined that:

> "A threshold question was the meaning of 'maximum applicable rates.' If 'maximum applicable rates' meant the real-world rates applicable to the shippers who purchased capacity on the subsidiaries' pipelines, then the March 15 FERC Actions—even if they become final—would not have a meaningful effect, because the majority of the shippers on Boardwalk's pipelines paid negotiated or discounted rates. As discussed in greater detail below, Baker Botts sidestepped that issue by interpreting 'maximum applicable rates' to mean 'recourse rates.' But that solution created another problem: Recourse rates do not change without a rate case."[40]

> "Yet to reach the conclusion that the phrase meant 'recourse rates,' Baker Botts declined to apply the doctrine of *contra proferentem* . . . If Baker Botts had reached that interpretive judgment, assessed each pipeline's risk of a rate case, relied on a full ratemaking analysis, and rendered opinions about the reasonably likely effect on recourse rates, then Baker Botts' decision to interpret 'maximum applicable rates' as 'recourse rates' would not have fatally undermined the Opinion . . . Baker Botts thus could have reached a reasoned conclusion that it was appropriate under the circumstances to consider extrinsic evidence in the form of Boardwalk's Form S-1, and Baker Botts could have concluded in good faith . . . that when drafting the Call Right, Rosenwasser meant to refer to recourse rates."[41]

> "But Baker Bott did not do those things. Baker Botts made an unstated assumption that resulted in the Opinion not actually interpreting the phrase 'maximum applicable rate' as 'recourse rates.' Baker Botts instead considered the highest rates that FERC would allow Boardwalk to charge in a hypothetical world that assumed there was a full market for the pipelines' services."[42]

---

[40] *Id.* at *58.

[41] *Id.* at *61.

[42] *Id.*

14

Contrary to the court's interpretation of "maximum applicable rates," all witnesses agreed the term meant recourse rates.[43]

In its analysis of Baker's model, the trial court looked to the model's underlying assumptions and took issue with each of the four assumptions. As discussed in more depth below, the court elaborated on its disagreement with all four "counterfactual assumptions,"[44] finding that they reflected a bad faith effort to generate a particular result in the Opinion.

For example, the trial court found that Baker "knowingly made unrealistic and counterfactual assumptions, knowingly relied on an artificial factual predicate, and consistently engaged in goal-directed reasoning to get to the result that Loews wanted."[45] The trial court took issue with the very predicate upon which the Opinion was based, finding that Baker's Rate Model Analysis "did not provide an adequate factual basis for the Opinion."[46] A snapshot of a few findings on the counterfactual assumptions demonstrates the point:

---

[43] *See* A574 (Michael Rosenwasser Trial Test. at 52:18–19) (noting that "maximum applicable rates" "referr[ed] to the technical term 'recourse rates[.]'"); A614 (Gregory Wagner Trial Test. at 209:4–5) ("Maximum applicable rate signaled to me the recourse rate in a gas pipeline[']s tariff."); A787 (Susan Court Trial Test. at 901:2–7) (noting that "recourse rate" was an appropriate interpretation of "maximum applicable rate"); A4250 (noting that Skadden's Mike Naeve agreed "maximum applicable rates" meant "recourse rates"); A5748 (Suedeen G. Kelly Dep. Trans. at 69:3–4) (noting that "maximum applicable rate" "can also mean the overall recourse rate.").

[44] *See Trial Opinion*, 2021 WL 5267734, at *55 (first counterfactual assumption); *id*. at *58 (second counterfactual assumption); *id*. at *59 (third counterfactual assumption); *id*. at *61 (fourth counterfactual assumption).

[45] *Id.* at *2.

[46] *Id.* at *66.

15

"The plaintiffs proved that the Opinion did not reflect a good faith effort to discern the actual facts and apply professional judgment. Instead, Baker Botts made a series of counterfactual assumptions that were designed to generate the conclusion that Baker Botts wanted to reach. Baker Botts then deployed those assumptions as part of a syllogism that turned on elementary subtraction. In the process, Baker Botts stretched its analysis in myriad other ways. The Opinion was a contrived effort to reach the result that the General Partner wanted."[47]

"The timing of the Opinion points in the same direction. Given the non-final nature of the Revised Policy, the avalanche of comments that FERC received, the direct linkage between the Revised Policy and the ADIT NOI that Boardwalk itself identified, and the uncertainty regarding the treatment of ADIT, Baker Botts could not have believed in good faith that it could render the Opinion before FERC provided further guidance. There were too many known unknowns. And an opportunity for clarity on these unknowns was on the horizon: FERC was likely to provide more guidance at its meeting on July 19, 2018. Baker Botts needed to wait."[48]

"The analysis of the Opinion is necessarily holistic. Although this decision has discussed various aspects of the Opinion individually, it is the totality of the evidence that results in the finding that the Opinion did not reflect a good faith effort. If Baker Botts had only stretched once or twice, or made an isolated counterfactual assumption, then it would not be possible to reject the Opinion. Under those circumstances, the court might have disagreed with Baker Botts' assessments, but those disagreements would not have been sufficient to support a lack of good faith. But here, the record as a whole depicts a contrived effort to generate the client's desired result when the real-world facts would not support it. Baker Botts produced a simulacrum of an opinion, and that flawed imitation did not satisfy the Opinion Condition."[49]

Contrary to the results-driven approach the court ascribed to Baker's conduct, the Baker model did not preordain the answer to the Call Right analysis. There had to be a finding of material adverse effect on the rates Boardwalk could charge in the future due to

---

[47] *Id.* at *55.

[48] *Id.* at *69.

[49] *Id.* at *70–71.

16

FERC regulatory changes. Baker considered the various data points made available to the lawyers and concluded that Boardwalk likely would suffer an MAE in the future — which is the event that would trigger the Call Right. The record suggests that the Opinion was the product of an intensive effort to analyze the Call Right and was not rushed[50] nor devoid of supporting information. Although Baker's Opinion was relatively short, it was supported by a 50-page memorandum, which itself was supported by 200 pages of documentary evidence.[51] Skadden opined "that, based on the factors and considerations outlined herein, it would be within the reasonable judgment of Boardwalk Holding to find that Baker Botts is acceptable counsel and that the Baker Botts Opinion is acceptable, as that term is used in the LPA."[52]

### 2. *The Public Comment Findings*

The second category of findings by the trial court relates to Boardwalk's public comments. I acknowledge that these findings are, to be frank, not favorable to the Appellants. In short, they demonstrate that Boardwalk was telling its regulators and the market one thing, while taking a different position with its counsel in drafting the Opinion.

---

[50] Baker was first contacted on March 16, 2018, to discuss providing the Opinion. *See id.* at *18. The Opinion was ultimately provided on June 29, 2018 — over three months later. *See* A5123 (Baker Opinion).

[51] *See* A4825–5080.

[52] A4736. Skadden listed the following factors and considerations that formed the basis of its opinion: "Framework for Boardwalk Holding's deliberations;" "[t]he actual 'Opinion of Counsel' Delivered by Baker Botts;" "Baker Botts' Qualifications;" "Baker Botts Consulted with Delaware Counsel;" "Baker Botts Retained and Consulted with an Expert Consultant;" "No Time Constraints;" "No Predetermined Outcome;" "Full Access to Information;" "Reasonableness of Assumptions;" "Reasonableness of Definitions;" and "Material Adverse Effect." A4740.

17

I recount some of these findings below. But I believe that these findings are not sufficient to render the Opinion a product of bad faith.

For example, in its comments to FERC on the Notice of Proposed Rulemaking ("NOPR") on March 15, 2018, Boardwalk stated that "[u]ntil the Commission provides a final decision on the treatment of ADIT, Boardwalk cannot correctly assess the impact of the Revised Policy Statement and ADIT on its pipelines' costs of service, and any response in the Form No. 501-G will be misleading and inaccurate."[53] Skadden noted that Boardwalk's public comments were "relatively unhelpful" and "could be problematic[.]"[54]

In response to the March 15 NOPR, Boardwalk scrambled to draft a press release, realizing that other pipeline companies had done the same.[55] Boardwalk's draft press release, circulated among its senior team, focused solely on rates. As the trial court noted, Boardwalk's team wanted to make "the release stronger by stating that the overall impact to Boardwalk and its *rates* would not be material."[56]

But when the time came to issue the press release, it was changed in a significant way. As the trial court noted, "Loews changed the wording of the release to address *revenues rather than rates*."[57] "In changing the language of the press release, Loews focused on the fact that the language of the Call Right did not mention revenues."[58] This

---

[53] B1228 (Boardwalk Public Comments to FERC at 14).

[54] B1310–11.

[55] *See Trial Opinion*, 2021 WL 5267734, at *16.

[56] *Id.* (emphasis added).

[57] *Id.* at *19 (emphasis added).

[58] *Id.*

version of the press release was the version released to the public. In handwritten notes associated with a counsel call, one of the lawyers wrote "Hypothetical Rates — not analyzed" and that even though Boardwalk faced "no actual change — no effect" on rates, such view would "screw min[ority unitholders.]"[59]

Although this evidence is not helpful to Appellants, the focus of the public comments was on the impact of the business in the *near term*.[60] But the focus of the Call Right did not center on the *near term* impact; it centered on the impact "*in the future*[.]"[61] In my view, this mitigates, to some degree, the impact of the public comments. Although this extrinsic evidence may provide a view of what occurred in the periphery — as Boardwalk lobbied its regulators for favorable treatment — the design of the Call Right was quite simple: it asked for an opinion of counsel on whether certain action by FERC would have a material adverse effect on the maximum applicable rate Boardwalk could charge in the future. At the end of the day, Baker concluded that it would. And the other lawyers agreed with Baker's conclusion.

---

[59] B1126.

[60] *See Trial Opinion*, 2021 WL 5267734, at *40 ("Loews also pushed for language focusing on the effects on Boardwalk's rates, rather than on revenue or other aspects of Boardwalk's business . . . [Loews'] analyses projected a short-term bump in the trading price, followed by a steady decline over time."); *id.* at *41 ("Boardwalk's initial press release had not limited the absence of a material impact to the near term, and the record does not suggest any additional analysis that would have shortened the time horizon of any effect. In reality, Boardwalk did not anticipate any material impact on revenue for the foreseeable future.").

[61] A3117 (LPA § 15.1(b)) (emphasis added).

### 3. The Pressure/Bullying Findings

The third and final category of bad faith findings by the trial court are those related to client pressure and bullying. These findings are directly related to the court's broader conclusion that bad faith undergirded Baker's Opinion from the start. The trial court connected the dots from client pressure to the supposed bad faith actions taken by Baker.

To illustrate a few of these findings, the trial court found:

"In the Opinion, Baker Botts made a series of counterfactual assumptions. One was explicit. The rest were not. Baker Botts did not make those assumptions legitimately because its client asked for a hypothetical opinion about a set of alternative facts. Instead, Baker Botts made those assumptions because Baker Botts knew they were the only way that the firm could purport to reach the outcome that its client wanted."[62]

"Baker Botts acted as if it was rendering a third-party closing opinion on a routine issue, which it plainly was not. The fact that Baker Botts rendered a non-explained opinion on the existence of a material adverse effect itself suggests that Baker Botts was serving Loews' interests."[63]

"Baker Botts strived to conclude that the General Partner could exercise the Call Right because that is what its client wanted. Rosenwasser had an additional, personal incentive to push the limits. He drafted the Call Right, and he understandably wanted that provision to accomplish what his client thought it should do. And Loews was a forceful client. Throughout the events giving rise to this litigation, Alpert demonstrated that he knew how to manipulate his outside counsel so that counsel would deliver the answers that he wanted to receive."[64]

The above findings do demonstrate that Loews exerted some pressure on Baker. It is not a far-fetched idea that Loews desired a certain result: it wanted to exercise the Call

---

[62] *Trial Opinion*, 2021 WL 5267734, at *55.

[63] *Id.* at *69.

[64] *Id.* (internal citation omitted).

20

Right.[65] The trial court described Baker's work as a type of "getting to yes" analysis, but the record, in my view, does not suggest blind obedience to client demands. I see no record evidence that Baker changed course due to Loews' actions.[66] What *is* in the record, however, are over 250 pages of support underlying the conclusion reached in the Opinion.

A finding that client pressure forced Baker's hand in interpreting Section 15.1(b) is further negated by the arrival of two additional firms at the same conclusion. Once Richards Layton was brought in, the firm undertook its own analysis and reached the same conclusion on what Section 15.1(b) required: "[l]ess than twenty-four hours later, Raju and his team gave advice orally to Baker Botts via teleconference. Raju advised that the '[b]etter [r]eading' was to 'look [at] rates more, not effects.'"[67] Skadden's team — which included a former FERC commissioner — also reached the consensus that maximum applicable rate meant recourse rates.[68] No one on the Baker team, the Richards Layton team, or the Skadden team testified that they felt pressure from Loews and acted accordingly. In fact, the record evidence demonstrates the exact opposite.[69]

---

[65] "[L]awyers tend to be responsive to the interests of their clients." *Williams*, 2016 WL 3576682, at *11.

[66] The Skadden presentation observed that "Baker Botts' fees are not contingent on the delivery of an opinion." A4743. The presentation also stated that Skadden understood "from Baker Botts that no predetermined outcome was conveyed or mandated to Baker Botts[.]" A4746.

[67] *Trial Opinion*, 2021 WL 5267734, at *34 (internal citation omitted).

[68] *See id.* at *28.

[69] *See* A578 (Michael Rosenwasser Trial Test. at 66:4–6) ("Neither Loews nor Boardwalk pressured us with respect to anything related to the substance of the opinion. Not anything."); A766 (Srinivas Raju Trial Test. at 817:18–21) ("Q. Did you feel that anyone at Loews or Boardwalk put pressure on you with regard to your advice on the acceptability question? A. No.");

Appellees spent time in their briefing[70] and again at oral argument[71] painting a picture of Loews as a Goliath-type client, who bent its counsel to its every whim. The trial court agreed with them, but only with respect to Baker, not Skadden[72] or Richards Layton. And sworn deposition and trial testimony from lawyers from all three firms indicates that no one changed course due to any client pressure.[73] For the foregoing reasons, I do not agree with the trial court that Loews pressured its lawyers into reaching a certain result.

## D. Conclusion

In sum, I believe that the trial court erred in holding that the Opinion was rendered in bad faith. Under existing Delaware law, opinions of counsel are entitled to deference. It is not the place of a trial court, or this Court, to substitute our own judgment for that of the lawyers who are asked to render legal opinions. Although lawyers should always strive to reach the legally correct answer, the law does not require that opinions of counsel be substantively correct. What the law requires is that lawyers undertake a good faith effort. Such good faith effort is entitled to deference. Although there are, for sure, outer limits to

---

A5552 (Richard Grossman Dep. Test. at 234:13–16) ("Q. Did Skadden reach that conclusion because of pressure from Loews? A. No. We reached that conclusion on our own.").

[70] Appellees Ans. Br. at 73. In an internal email, Alpert — Loews' general counsel — wrote that he "[r]eally had to beat on Skadden, but they fell in line finally . . . I will look to other firms re potential litigation." B1247.

[71] *See* Oral Argument, at 55:10–56:10, https://livestream.com/delawaresupremecourt/events/10612698/videos/232917888.

[72] *See Trial Opinion*, 2021 WL 5266734, at *27 (noting Skadden's careful analysis). Appellees conceded at oral argument that there were no bad faith findings as to Skadden. *See* Oral Argument, at 51:22–43, https://livestream.com/delawaresupremecourt/events/10612698/videos/232917888.

[73] *See supra* n.69.

this deference, this case does not push beyond that boundary in my view. Because the trial court's findings of bad faith are inextricably intertwined and dependent upon this legal error, I would reverse. In the aggregate, the record rather supports the conclusion that Baker's Opinion was rendered in good faith and, at a minimum, was not rendered in bad faith.